## JOHN W. WRIGHT v. MARY HAWKINS ET AL.

A survey of public land within the Mississippi and Pacific railroad reserve, made in August, 1855, while the reserve was still subsisting, was contrary to law, and void, and did not sever the land surveyed from the mass of the public domain. (Paschal's Dig., Art. 5038, Note 1107.)

The fact that a patent was issued upon such illegal survey in obedience to a special act of the legislature repels the presumption which, in the absence of evidence, might otherwise arise from the issuance of the patent, that a re-survey of the land was made after the reserved lands were opened for sale and settlement. (See the statement of the case for the act.)

Such illegal and void survey interposed no impediment to an appropriation of the land by the location upon it of land scrip issued under the provisions of the 4th section of the act of August 26, 1856, authorizing the location, sale, and settlement of the Mississippi and Pacific railroad reserve; and such a location gave to the holder of the scrip an equitable title to the land, which was secured to him by all the constitutional guarantees provided for the protection of private property. (Paschal's Dig., Arts. 5038, 5045, Notes 1107, 1108.)

It was not within the power of the legislature, after an appropriation of the land by virtue of such scrip and location, to make a valid grant of the land to another person and not for a public use; and it is immaterial that the person holding a patent for the land under the legislative grant claimed under a colonist of Peters' colony, for whom the land had been illegally surveyed in 1855. (Paschal's Dig., Note 1149.)

The proposition is not maintainable, that the legislature, so long as the State retains the legal title to land, may make any disposition of it deemed fit, regardless of the equitable rights or titles of individuals. Such a doctrine cannot be sanctioned by the courts so long as the constitution restrains the legislature from taking private property, except for public use. Former adjudications of this court have settled this question beyond further discussion. (4 Tex., 470; 7 Id., 259; 20 Id., 612; and see Paschal's Annot. Const., Notes 157, 258, 259.)

The act creating the Mississippi and Pacific railroad reserve is not a private, but a public act, of which the courts of the State will take judicial notice.

The fact that a particular tract of land is within the reserve may be satisfactorily established, not only by positive proof, but by circumstantial or presumptive evidence, or it may be deduced as an inference from other facts which have been proved or are within the judicial knowledge of the courts.

The courts must take judicial cognizance of the division of the State into counties, of their localities and contiguity with regard to each other, and of their boundaries and extent when defined by public laws. From these

facts, together with the extent of the reserve as judicially known to the courts, it is mathematically demonstrable that all lands lying in the county of Ellis are within the reserve mentioned.

The fact that the surveyor of Ellis county received and recognized without objection a file of land scrip which could only be located on lands within the Mississippi and Pacific railroad reserve, is of itself a fact from which the conclusion might properly be deduced that the land designated in the file lies within the limits of the reserve.

APPEAL from Ellis.  The case was tried before Hon. NAT. M. BURFORD, one of the district judges.

The subject of building railroads in Texas became a very exciting one as early as 1850.  Previous to that time liberal railroad charters had been granted, among which may be enumerated a railroad charter from Galveston to Red river, granted in 1848 to Ebenezer Allen and others, and another from Harrisburg to the Colorado river, now known as the Buffalo Bayou, Brazos, and Colorado railroad; and later, the San Antonio and Gulf railroad charter.  (San Antonio v. Jones, *ante*, 19.)

After the settlement of the Texas boundary question in 1850, (which was then one of the political measures of compromise,) and the grant to Texas of $10,000,000 in consideration of the cession, the question immediately arose, what should be done with the residue of the money after paying the public debt.  (For historical facts see the great case of Texas v. White & Chiles, 25 Tex. Supp., 465, and Paschal's Dig., Arts. 442 to 451 and Arts. 5320 to 5323, and notes thereon.)

During the session of the legislature of 1850–1851, propositions received practical form by the introduction into the house, by Onesimus Evans, of Bexar, of what was known as Isaiah A. Paschal's plan of building railroads, by granting aid by the State in the shape of donations of land and the loan of money.  Texas at that time had over one hundred million acres of public land, and a remainder of $4,000,000 of United States Texan indemnity bonds, after paying the public debt.  It was proposed to give

sixteen sections of land to the mile, and to lend $6,000 to the mile to aid railroads, the interest of the loans to be donated to the cause of education.

Opposed to this scheme were the enlarged views of Lorenzo Sherwood, which proposed to use all of these vast means in building roads to be owned and operated by the State, in analogy to a well-regulated system of turnpike roads.

Neither system succeeded at that legislature. Indeed, at that time there were only twenty-six miles of railroad west of the Mississippi river, and there were able debaters in the Texas legislature who had never seen a railroad, and who had no clear comprehension of the material out of which they were constructed.

The question, however, was put afloat before the people in the next election, and the loan and land-donation system prevailed. (Paschal's Dig., Arts. 3484, 3502, and Arts. 4945 to 4968.) And into the discussions entered the great scheme of extending a railroad from the Mississippi river, centrally through Texas, to the Pacific ocean. This measure rose in popularity above all others. On the 21st December, 1853, the Legislature of Texas passed "An act to provide for the construction of the Mississippi and Pacific railroad." The secretary of State printed this act in the "private acts" of that session, and hence the contest in this case about the necessity of proving it. (Paschal's Dig., Art. 3712, Note 837.)

The act incorporated a railroad company; but it put the franchise on sale in favor of those who should bid on prescribed terms; and among the conditions were, that the successful bidders should deposit $300,000 in cash or safe stocks in the treasury to insure good faith. It was provided that the road should receive twenty sections of land per mile, to be taken in alternate sections; and to make this munificent grant the more valuable, the reservation was granted upon which this controversy mainly turned,

and which will be found on the 7th page of the Special Laws of 1853, in Note 1107, p. 844, of Paschal's Dig., and in Sherwood v. Fleming, 25 Tex. Supp., 408; and therefore the first clause only is here given:

The 14th and 19th sections of the act to incorporate the Pacific railroad read as follows:

"All the vacant and unappropriated public lands belonging to the State of Texas, east of the 103d parallel of longitude west from Greenwich, and embraced between the parallels of latitude 31° and 33° north, and all of the vacant and unappropriated lands belonging to the State west of the 103d degree of longitude, and embraced between the parallels of latitude 30° 30' and 32° north latitude, be, and the same are hereby, held in reserve by the State, for the purposes herein set forth, until the track of said road is located by said company; from and after which time, there shall be held in reserve by the State, for the purposes above set forth, all of the vacant and unappropriated land belonging to the State, lying within thirty miles on each side of said road, until the same is surveyed and located in accordance with the provisions of the 13th section of this act: *Provided*, That the alternate sections herein reserved to the State shall so continue to be reserved to the use of the State until otherwise directed by law. *And further provided*, That said surveys shall be made in a square, and those adjoining the road shall front one mile thereon, and no more, unless prevented by surveys made previous to the passage of this act.

" This act shall not be so construed as to affect any right of location or entry, pre-emption right or survey, heretofore acquired, in the district of country reserved and set apart for the use of said road."    This reservation was in full force until the 1st January, 1857. (Kimmell v. Wheeler, 22 Tex., 84.)

On the 31st December, 1857, the legislature passed " An

act to define the northern boundary line of the Mississippi and Pacific railroad reserve," which reads as follows:

"The beginning point on the eastern boundary of Texas of the northern line of the Pacific railroad reservation shall be at the southwest corner of the State of Arkansas and the northwest corner of the State of Louisiana, and thence west to the town of Linden, in Cass [Davis] county, and Dangerfield, in Titus county; thence west to Big Cypress, and thence with south boundary line of Titus county to the southeast corner of Hopkins county; thence to the southwest corner of said Hopkins county, and thence west to the southeast corner of Collin county, and thence west with the south boundary lines of the counties of Collin, Denton, Wise, Jack, and Young, to the southwest corner of Young county, and thence west to the eastern boundary of New Mexico, and thence south to the southeast corner of New Mexico, and thence west with the south boundary line of New Mexico to the Rio Grande.

"The application and operation of 'An act to authorize the location, sale, and settlement of the Mississippi and Pacific railroad reserve," passed August 26, 1856, shall be governed and controlled by said boundary line as set within the 1st section of this act: *Provided*, That nothing in this act contained shall be so construed as to prevent the patenting of scrip heretofore issued by authority of the act entitled 'An act to authorize the location, sale, and settlement of the Mississippi and Pacific railroad reserve,' which may have been, or may hereafter be, located north of the boundary line, as herein proposed, and south of the lines as recognized by the general land office." (Paschal's Dig., Arts. 5039, 5040.)

The other public laws which bear immediately upon the subject will be found in the same work, Arts. 5041 to 5051. These laws have been most critically discussed in the cases of Kimmell v. Wheeler, 22 Tex., 84; Sherwood

v. Fleming, 25 Tex. Supp., 407; and Woods v. Durrett, *ante*, 429.)

The general question of boundaries, described in Art. 5039, and referred to by the chief justice as things within the judicial knowledge of the court, will be found in Paschal's Dig., Arts. 301, 309, 311, 345, 348, 411, 427, 430 to 448, being under the chapter of "BOUNDARIES COUNTIES," and here cited in the order of calls in the "act to define the northern boundary line of the Mississippi and Pacific railroad reserve," just quoted.

Other public acts, to which the chief justice alludes as being within the creation of the State policy, will be found collected in Paschal's Dig., titles EDUCATION and RAILROADS. Reference is also made to the case of The State v. The Southern Pacific Railroad Company, 24 Tex., 121.

The scheme of building a Pacific railroad between Vicksburg and San Francisco, which were really the objective points, made slow progress. Our opportunity was greatly deferred, if not lost, when we followed the secession *furore*. The litigation, as well as legislation, will show, that no sooner was the reservation declared, than the desire to appropriate the reserved lands became chronic.

On the 20th day of November, the appellant, John W. Wright, filed a certificate (or scrip) with the district surveyor of Ellis county, and demanded a survey of land within this reservation.

The petition also showed, that after the petitioner's location, the land had been patented to one James Starritt, as a colonist of Peter's colony; but it alleged that this patent was void, because the certificate had been obtained by fraud, in that the grantee never was a colonist, and never proved up the right to the certificate. He made the grantee of Starritt, Edward H. Tarrant, a party; prayed for cancellation of that patent, and for a *mandamus* to compel the surveyor to survey his location made on the 20th of November, 1857.

The scrip was issued to Wright on the 31st October, 1857, under the 4th section of the "act to authorize the location, sale, and settlement of the Mississippi and Pacific railroad reserve." (Paschal's Dig., Art. 5045, Note 1108.) The location called for land in "Ellis county." The administratrix of Tarrant answered, and set up the Tarrant title; the surveyor gave this title as a reason for not surveying.

An amended answer of Tarrant's administratrix set up that the Starritt survey was made on vacant land, and that it was patented under a special act of the legislature, of 30th January, 1858. All the muniments of this title, including oath, certificate, survey, special act and patent, were plead. The constitutionality of this retrospective act was attacked by special exceptions and pleas, on the ground that Wright's location was anterior to Starritt's.

The plaintiff proved his location of 20th November, 1857, the tender of the surveying fees, and demand of a survey. He also attacked the title of Starritt, for reasons set up in the pleadings. All the facts certified related to this title of Starritt. The special act, which became a subject of discussion in the opinion, reads as follows:

"SECTION 1. The commissioner of the general land office is hereby required to patent the land surveyed by virtue of certificate No. 15, issued to James Starritt by the county court of Ellis county on the 25th day of April, 1853, the patent to issue as in other cases: *Provided,* The same survey does not conflict with older legal surveys and is correct.

"SEC. 2. That this act take effect and be in full force from and after its passage. Approved January 30, 1858."

The case was submitted to the judge, who decided in favor of the Starritt patent, and dismissed the application for a *mandamus.*

The questions therefore were:

1. As to the effect of a location made on the Pacific railroad reserve, while that reserve existed.

2. As to the effect of the private act of the legislature authorizing a patent, without a new location, after the repeal of the reservation.

*J. W. Ferris*, for the appellant.—The survey of Starritt is void, because it was made during the pendency and within the limits of the Mississippi and Pacific railroad reserve. That reserve was made by the act of December 21, 1853, and was lifted on the 1st January, 1857. This survey was made in 1855. (See Kimmell v. Wheeler, 22 Tex., 84; Laws 6th Leg., 56.) There appears in the statement of facts no proof that this survey was within the limits of said reserve, but the field-notes call for Ellis county. The law defines the boundaries of the reserve. The act of 1856 provides for its sale and settlement. The act of December 21, 1857, defines the northern boundary, and the court can take judicial notice that Ellis county is within the lines of latitude and boundary defined. (O. & W., Art. 1292.)

But it may be said that the special act of the legislature and the patent to Starritt relate back, and perfect the title from its incipiency. Not so, as against an equitable title, without some prior equitable right previously acquired by the patentee. The cases of Warren v. Shuman, 5 Tex., 456; Hart v. Gibbons, 14 Tex., 216; Lewis v. Mixon, 11 Tex., 570, and Jennings v. De Cordova, 20 Tex., which are supposed to bear on this point, are reviewed in the case of Hamilton v. Avery, 20 Tex., 634, and it is said by the court that, "in all the cases of this character, the right of the party had legally attached to the land by the performance of duty in some of the steps, by a legal survey, pre-emption, settlement, &c., and this is what is called an equity." Starritt had taken none of the legal steps. His first step was a flagrant departure from the law. He had not as much as a floating equity, or *scintilla juris*, which is said to be acquired by the holder of a genuine certificate. It might

have been within his reach to have acquired land as a colonist, but he failed to take the first legal steps required by the law, and therefore had no equity which could attach to land.

II.—There being no prior equity, the plaintiff acquired from the State of Texas, by his land scrip and location, a valid subsisting equitable right to the land. The plaintiff holds scrip issued to him by the State for a valuable consideration, which was filed or located on the land under the entry law of 1856, (Acts of 1856, p. 56,) filed on vacant land November, 1857. He had twelve months in which to have it surveyed. (O. & W. Dig., Art 1210.) Patent issued to Starritt in February, 1858, and this suit was brought within the twelve months.

We ask the attention of the court to the entry law of 1856, under which the plaintiff's right was acquired. It provides that the entry must describe the land, be recorded, must not leave the office, and must be returned, with the field notes, to the general land office. So far as we are advised, this law has not as yet received any construction from our courts, and more particularly the 2d and 3d sections thereof. And in this connection we will say, that the act provides two modes of appropriating land, viz, by entry and survey. The 2d section prohibits the lifting or floating of certificates after file or survey on land not previously appropriated, and, guarding the rights of the holder against mistakes by the officers, it provides for a correction in case of a conflict of entries or surveys. By the 3d section it was intended to protect old surveys against frivolous files, annoyances, and suits under false pretense. It is therefore provided, that a party making entry on land which "appears to be approbative," &c., shall abide by the same, and, should judgment go against him, he shall forfeit his certificate. By this it was not intended to protect old surveys which were void, but to impose a risk on the attacking party, to discourage suits without good cause.

By this law, which attaches the certificate to the land filed on, the owner of a valid entry has as valid and as subsisting an equitable title as the owner of a survey, and, more so, as a certificate could formerly be floated after survey.

"Courts of equity have considered an entry as the commencement of title, and have sustained a valid entry against a patent founded on a prior defective entry, if issued after such valid entry was made." (Hoofnagle v. Anderson, 7 Wheat., 212.) This rule is well settled.

III. But it is affirmed that the special act of the legislature, authorizing patent to issue on the Starritt survey, was a confirmatory act, which overrides the equities of plaintiff; that the political authority could grant the land to any one, at any time before the fee had passed out of the State. We reply, that this confirmatory act is retroactive, and impairs the obligations of the contract between the State and the plaintiff, in violation of the 14th section, 1st article of the constitution, and it is therefore void.

This act of the legislature, if sustained on the assumption above, imperatively takes from the plaintiff his equitable title, and in effect nullifies the scrip which the State has sold for a valuable consideration. No patent could issue on the defendant's survey. The plaintiff was proceeding according to the forms of law to perfect his location into a patent, when he is estopped by the political authority and his property in effect confiscated.

1. The constitution embraces and applies to executed and executory contracts, to express and implied contracts. (2 Story on Con., §§ 1376, 1377.) What is the obligation of a contract? It is "the law which binds the parties to perform their agreement." (Id. § 1378.) Then, "it is perfectly clear that any law which enlarges, abridges, or in any manner changes the intention of the parties, resulting from the stipulations in the contract, necessarily impairs it." (2 Story on Con., § 1385; Ogden v. Saunders,

12 Wheat., 284; Golden v. Prince, 3 Wash. C. C., 319.) "Laws affecting the remedy are generally not within the scope of this inhibition, but they may become so by impairing or destroying a right." (Paschal v. Perez, 7 Tex., 365; 2 Story on Con., § 1385; Sturgis v. Crowninshield, 4 Wheat., 200; Ogden v. Saunders, 12 Wheat., 284.) "Any deviation from the terms of a contract, however minute, impairs its obligation." (Green v. Biddle, 4 Conds., 370.) "Contracts and grants made by a State are not less within the reach of the prohibition than contracts and grants of private parties." (2 Story on Con., § 1391.) Executory contracts are as fully protected by the Constitution as executed contracts. (Fletcher v. Peck, 6 Cranch, 88; 1 Kent's Com., 414; New Jersey v. Wilson, 7 Cranch, 164.)

In this case, the State of Texas had sold to plaintiff scrip for two hundred acres of land, with a guaranty that it might be located and surveyed on any land not legally appropriated within the railroad reserve. When the plaintiff located his scrip he was obligated by the general law to abide by his location, and, if defeated on the trial of his right to the location, to forfeit his scrip; and the State was equally obligated not to interfere with the location when made, but to convey title on the performance of the steps further required. And can it be held, that an act of the legislature granting the land thus lawfully located to another, and in effect annulling the plaintiff's scrip, is not a flagrant violation of the obligations of the contract made with plaintiff? It may be said, however, that this act only affects the remedy. But we reply, that it not only destroys the remedy, if remedy it is, but every right the plaintiff had acquired. For, as said before, having located on land which "appeared" to be surveyed, this act would expose his scrip to be forfeited by the general law.

2. The Constitution guaranties protection also against retroactive laws. "Mr. Justice Story defines a retrospect-

ive law to be one which takes away or impairs vested rights acquired under existing laws, or creates a new obligation, or imposes a new duty, or attaches a new disability in relation to transactions already past." (Paschal v. Perez, 7 Tex., 365; 2 Gall., 105.) What constitutes a retroactive law is discussed at some length also in the case of De Cordova v. The City of Galveston, (4 Tex., 470.)

What are vested rights? This question was well argued in the case of Hamilton v. Avery, above noted, 20 Tex., 633, and the relation of equitable and legal titles is very clearly and logically discussed by the court. It is there said, that "a subsisting equity, by the laws of this State, confers a right of property by as strong a sanction as that which exists by a right purely legal. Our courts have recognized a survey, by virtue of a valid certificate, as a valid right, a right of property, as fully as any other rights." This right is in nothing less meritorious than a right secured by patent; the citizen has done and performed every duty incumbent on him about it, and has paid the consideration," &c. (Id., 635.) This opinion of the court had reference to rights, as defined by the law previous to the entry act of 1856. Since the passage of that law, attaching the certificate to the land filed on, the owner of a valid entry has as valid and subsisting an equitable right as the owner of a survey, and more so, as a certificate could formerly be floated after survey. This location by plaintiff was a distinctive subsisting right, which could be enforced by *mandamus* against the government. (5 Tex., 480.)

This legislative grant also, in the language of Justice Story, "Attaches a new disability in relation to transactions already past." (2 Gall., 105.) It destroys the plaintiff's right to the land already acquired, and exposes him, as aforesaid, to a forfeiture of his scrip.

But the broad ground is assumed that, at any time before the fee passes out of the State, the sovereign power

can grant the land to whoever it may desire to favor; and this was the position assumed by the court below. Is this power what is termed the right of eminent domain? We submit, that this right of eminent domain is the ultimate power retained by the State in all cases, to be exercised only for the public good. It is the right to take private property for the public use upon a just compensation. The subject was discussed at length by Justices Daniel, McLean, and Woodbury, in the case of West River Bridge Company v. Dix, 6 How., 507. It was then said by the court, "This right of eminent domain does not operate to impair the contract effected by it, but recognizes its obligation in the fullest extent; it insists only on the true nature and character of the right invested." In the separate opinion of Justice McLean, in the same case, he says: "It is argued that, if the State may take this bridge, it may transfer it to other individuals under the same or a different charter. This the State cannot do. It would in effect be taking the property from A to convey it to B. The public purpose for which the power is exerted must be real, not pretended."

We are not able to find a single case which sustains the position assumed by appellee. In the case of Kemper, Administrator v. The Corporation of Victoria, 3 Tex., 135, the certificates had been rejected as fraudulent, and there was no valid subsisting right outstanding against the legislative government; and the opinion should be construed in reference to that state of facts. In the case of Paschal v. Perez, 7 Tex., 366, the turning point of the decision is stated by the court, viz: "It is no longer an open question, that an imperfect title, emanating from a former and unrecognized by the existing government, forms no foundation for an action." (Id., 366.) This also is the point of decision in the cases of Choteau v. Eckhart, 2 How., 354; LeBois v. Bramell, 4 How., 449; and Grignon v. Martin, 2 How., 449; also in the case of Jones v. Me-

nard, 1 Tex., 771. They were imperfect titles of another government, which required legislative sanction to become an obligation against the existing government. Not so with an equitable title emanating directly from the State, with a constitutional guaranty against retroactive laws and laws impairing the obligations of a contract.

I imagine it would be difficult to assign a plausible reason why rights acquired under a patent are any more protected by the constitution than rights acquired by certificate and location. In the one case, the evidences of right to land are more complete, but the right itself is not more valuable, nor more sacred. To say that the patent conveys the fee and the location does not, does not furnish a reason why one is the most deserving of protection. Why are not the obligations of the State to the citizen as strong in the one case as the other?

*Hawkins & Kemble*, for the appellees.—I. Appellant's first proposition is, " That Starritt's certificate, location, and survey were absolutely void." And from this he deduces, "that such void proceedings could give Starritt no such right as a subsequent 'patent' or 'grant' from the State could reach back, take hold upon, and make valid from the beginning."

We dissent from the proposition itself, and if that shall fall, the deduction from it will of course follow and fall with it.

We call attention to Burwell's Law Dic., part 2, tit. VOID AND VOIDABLE, and especially to a quotation from Metcalf's Rep., per Dewey, J., Bouvier's Institutes, vol. 2, p. 27; Id., vol. 1, p. 296, § 770; Id., p. 303, §§ 785, 787; Bacon's Abridgment, tit. VOID AND VOIDABLE; Fowler v. Stonum, 11 Tex., 502.)

From these authorities we deduce the following rule, viz: That any act of one or of two parties is absolutely void, as it affects another or third party, only when such

30—XXVIII

act is immoral, or contrary to public policy, or is fraudulent by statute. It will be seen from above authorities that an act may be void for some purposes, or as to some parties, and valid as to others, and all such may be ratified and made fully valid from the beginning.

We hold that the worst light in which Starritt's title can be viewed, up to the inception of appellant's claim, is, that he had made what the State deemed an immaterial departure from the manner of proving a particular fact, in taking the steps necessary to the acquisition of perfect title to a particular tract of land, after he had fully performed the duties which entitled him to the land; and of this immaterial departure we hold no one had or has a right to complain except the State. No one was deceived or defrauded. Starritt claimed that land as his, and all could know it, and keep off until the State and Starritt had settled their own affair. Patent might have been refused, but that was optional with the State; no one else could interfere. In support of this, we refer to Hamilton v. Avery, 20 Tex., 639, and authorities there cited. From what is there said, we understand three different degrees or kinds of right to land are defined:

1. A perfect and purely legal right, which is evidenced by "patent" or "perfect grant" from the State.

2. "A subsisting equity," which is such a right as exists where a party has strictly and fully performed all the duties and requisites prescribed in taking hold of, or attaching his claim to, a particular tract of land, and has not been in default, nor guilty of laches in any respect, but has not yet received a "patent" or "perfect grant." Such a right could not be recognized in a court of law strictly, but could be in a court of equity, and of course in our courts, which exercise both jurisdictions.

3. A dormant equity, which is such a right to land as one acquires who has performed the meritorious acts, or otherwise paid the consideration which would entitle him

to some land, and has, in good faith and without fraud, attached his general right to "some land" to a particular tract by the performance of some of the several acts required of him to fully designate the land, and acquire a perfect title, but where he is at the same time in default by not having performed all of such acts; or, having performed some of them, has not followed them by the performance of others, within the time or in the manner prescribed. Such a right attaches to the land and designates it, but cannot, without further legislation, be enforced in our courts.

Such a right was Starritt's, viewed in its worst light, before his legislative grant.

The first is a right in the land.

The second a right to the land.

The third is a right to the land, but resting in the conscience of the parties, and which may or may not be made active, at the option of the parties. Third parties cannot interfere.

We hold it to have been settled by judicial authority that the State may, by legislative act, waive its right to exact of the applicant for land any one or more of the duties enjoined upon him: such as "obtaining a certificate,'" "locating and surveying," "recording and returning field-notes," &c., or the manner of performing any of these, for the purpose of obtaining a patent to a particular tract, and may grant the land by perfect title, and preserve the applicant's right in its full vigor, as if there had been no such default in duty, unless, between the time of such default and such waiver, the State has granted the land by perfect title to another. (See Hamilton v. Avery, 20 Tex., 634; Jennings v. De Cordova, Id., 512; Hart v. Gibbon, 14 Id., 216; Warren v. Shuman, 5 Id., 456; Lewis v. Mixon, 11 Id., 570.)

From these authorities, particularly Lewis v. Mixon, 11 Tex., 568, it will be seen that nothing less than the actual

issue of patent to another during the default would destroy or control the power of the State to waive the defect and grant the land to the original applicant.

But it is insisted by appellant that this right of waiver by the State applies only in cases where the right of the first applicant was once perfect, that is, that in its inception it was such a right as he might have forced a patent upon through the courts, but which right afterwards became dormant by failure to perform some subsequent duty, or by laches, &c. This argument necessarily assumes that in the several duties or acts to be performed the State may waive the second, but cannot waive the first; that when one duty has been neglected or misperformed, the performance, or rightly performing others, would be of no avail, and consequently that a neglect or misperformance of the first duty in the order of enumeration would vitiate and make void not only that but all others subsequently performed.

We do not so understand the authorities. (See particularly Hamilton v. Avery, 20 Tex., 634, 635; Berry v. Gamble, 3 How., 32; Stoddard v. Chambers, 2 How., 313; Mills v. Stoddard, 8 How., 345; Hart v. Gibbon, 14 Tex., 215.) It will be seen that it made no difference that the first step taken, the location of the certificate, was forbidden by law; the United States could and did still grant the land, and the grant took effect and legalized the false step.

And upon principle we can see no reason why the State could not as well waive the manner of proving out a certificate at the time in which a survey and field-notes should be returned, or the time within which a certificate should be filed or located after its issuance. The rights of third parties would be no more likely to be interfered with in the one case than in the other, and, as respects the rights and interests of the State, she herself judges of that when she waives or refuses to waive the defect.

And it is important to keep in view the fact, that this is not a patent issued by the land office under the general law, but by direct command of the legislature; they themselves having judged of the equities between the parties.

There can be no pretense that the commissioner of the land office exceeded his authority.

But it is assumed and argued by appellant that Starritt's survey was made within and during the life of the Mississippi and Pacific railroad reserve.

We answer, there is nothing in this case to show that there was ever such a reservation made; nor, if made, the locality of it. The act creating the reserve was a private act, so regarded by the compilers of the laws and by appellant in his brief. Such an act could not be regarded by the courts unless plead and proved.

The locality of the reservation cannot be known for the same reason. The act of 21st December, 1857, (Stat. Laws, 130,) does not fix the south lines of the counties of Collin, Denton, &c., as being on latitude 33° north, as will be seen from the act itself.

The locality of Ellis county is not fixed by latitude and longitude. (See act December 20, 1849, Stat. Laws, 16.)

Courts cannot judicially know the precise boundaries of counties, nor their extent, nor their distance from each other. (1 Greenl. on Ev., § 6, p. 8; Hare & Wallace's notes to 1 Phillips on Ev., 625.)

But if the survey be admitted to be within the reserve, appellant's scrip was not located till after it was lifted, which would have had the effect to legalize appellees' location and survey. Appellant located in November, 1857. The reservation was removed in January preceding. (See act January 1, 1857.) Besides, this difficulty, if any such existed, would be cured, like the irregularity in the certificate, by the act granting the land to Starritt. The case of Kimmell v. Wheeler, it is true, uses the term "void" as applicable to surveys within that reserve; but

we think it was not intended to mean by that term that such surveys could not be made valid from the beginning by act of the legislature.

Moore, C. J.—This suit was brought by the appellant against the surveyor of Ellis county, to cause him to survey for appellant two hundred acres of land situated in said Ellis county, which he claimed to be entitled to by virtue of a file and location made on the 20th day of November, 1857, with that amount of land scrip issued to him by the commissioner of the general land office, under the provisions of the law of August 26, 1856, authorizing the location, sale, and settlement of the Mississippi and Pacific railroad reserve.

The land claimed by the appellant had been previously surveyed on the 31st of August, 1855, by virtue of a certificate issued on the 25th of April, 1853, by the county court of Ellis county to James Starritt, as a colonist in Peters' colony; and after appellant's location it was patented to said Starritt by authority of a special act of the legislature passed January 30, 1858. The land was claimed under this survey and patent by Edward H. Tarrant, and he was joined in the action as party defendant. Shortly after the commencement of the suit Tarrant died, when his widow, now Mrs. Hawkins, who is his sole heir and legal representative, was made a party.

The verdict in this case is unsupported by either law or evidence, and the judgment is therefore erroneous and must be reversed. The land is situated within the Mississippi and Pacific railroad reserve, and was not therefore subject to appropriation by location of the certificate to Starritt at the date of his survey. (Kimmell v. Wheeler, 22 Tex., 84.) The survey was contrary to and in violation of law, and hence absolutely void. The land was not severed thereby from the mass of the public domain. There is no evidence tending to prove a re-survey of the land

under this certificate after this might have been legally done. The evidence repels such a conclusion.

The patent was issued on the survey by the direct command of the legislature, and hence the presumption cannot be indulged from it that the commissioner would not have issued it unless there had been a subsequent valid survey to authorize its issuance. The land being unappropriated at the date of appellant's file, his location gave him an equitable title to it, which was secured to him by all the constitutional guaranties for the protection of private property.

The counsel for the appellees, in an elaborate, ingenious, and very able argument, maintain the proposition, that the legislature may, as long as the legal title remains in the State, make such disposition of the public domain as it may deem fit, irrespective of the equitable rights or titles of individuals. However plausibly such a theory may be presented, or however ably it may be sustained, it cannot be sanctioned by the courts so long as the constitution restrains the legislature from taking private property except for public use.

But if there were ever any doubt on this question, it has been so fully settled by former decisions of the court as to preclude further discussion. (Howard v. Perry, 7 Tex., 259; Hamilton v. Avery, 20 Tex., 612; De Cordova v. Galveston, 4 Tex., 470; Sherwood v. Fleming, 25 Tex., Supp., 408.)

It is also insisted by appellees that the land in controversy is not shown by the evidence to be within the Mississippi and Pacific railroad reserve, especially as the law creating this reserve is, as they insist, a private act, and that it cannot therefore be said that the survey of Starritt's certificate was on this ground illegal and void. We cannot yield our assent to the proposition, that the law creating this reserve is a private act, of which the courts of the country cannot take notice. If it were the purpose of the

legislature to create under this law a private corporation, it legislated in doing so upon matters of general and public interest, and in a way to affect the rights of the people of the State at large. From the inception of this law, there has been no subject of internal and domestic legislation which has attracted more general observation and attention. It has almost continuously, from the passage of the law to the present time, been forced upon the attention and been a matter for discussion in every department of the government. It occasioned a fundamental change in the policy of the State in respect to its public domain, and was the foundation upon which its general policy of internal improvements has been built. It has been recognized and referred to time and time again in numerous general laws.

It is also urged that, if the court can take notice of the law creating the reserve, still there must be proof to show that the land in dispute is situated within it. This is conceded. But it does not follow that it may not be satisfactorily established from circumstantial or presumptive evidence, or deduced as a fact from other facts which are proved or are of judicial knowledge. The reservation east of the 103d parallel of longitude west from Greenwich is from the 31st to the 33d parallel of north latitude. The courts must certainly take notice of the division of the State into counties, and of their locality and contiguity with respect to each other, and of their boundaries and extent, when defined by public laws. And unless they can take notice of the rudimental principles of natural science, and of the geographical positions of these political divisions of the State, the courts cannot say what counties are within these parallels. At least there can be no doubt of this in reference to the county in which this land is situated. The court can certainly take notice of the fact that the breadth of this reservation, according to its original. limits, was one hundred and thirty miles, and that, with-

out any material change in this respect, the northern boundary was fixed with the northern boundary of Dallas county, which is but thirty miles square, and that the south boundary of Dallas is the north boundary of Ellis; and, although the extent of Ellis county is not defined in the law creating it with the certainty there is in the law creating the county of Dallas, yet the calls describing its boundaries are sufficiently specific to make it a fact of mathematical demonstration that the entire county lies within the reservation.

The same conclusion may be properly deduced from the fact, that the scrip upon which the appellant made his location could only be located on lands in the reserve. It was received and recognized as a valid appropriation of the land by the officer charged with the duty of making the survey. If the land were not in the reserve, it was the duty of the surveyor to have rejected the file; not having done so, the court should infer that the land upon which it was located was within the territory, subject to appropriation by claims of this kind.

As the merits of the controversy seem to be conclusively settled by the former decisions of the court on the questions to which we have adverted, we have deemed it unnecessary to discuss the validity of the certificate under which appellees claim the land, and upon which alone the case seems to have turned in the District Court.

The judgment is reversed, and the cause

REMANDED.