

# NUMBER 13-17-00196-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

MICHAEL COCHRUM,                                                        Appellant,

v.

NATIONAL BUGMOBILES, INC.,                                              Appellee.

## On appeal from the 24th District Court
## of Victoria County, Texas.

# MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Longoria and Hinojosa**
**Memorandum Opinion by Justice Hinojosa**

In the trial court, appellee National Bugmobiles, Inc., a pest control company, sued appellant Michael Cochrum, a pest control technician, for breach of contract shortly after Cochrum resigned from Bugmobiles and immediately joined Stout Pest Control, another pest control company. Bugmobiles obtained a temporary injunction that Cochrum, by

two issues, asks us to modify. First, Cochrum argues that the temporary injunction is void under Texas Rule of Civil Procedure 683 because it fails to define in reasonable detail and without reference to the pleadings and documents the acts to be restrained. Second, in what we classify as four sub-issues, Cochrum argues that the evidence is legally and factually insufficient to support: (a) the geographic restrictions; (b) the customer restrictions; (c) the trial court's finding that Bugmobiles would suffer a probable, imminent, and irreparable injury in the interim; and (d) the amount of the bond. We modify the temporary injunction and affirm it as modified.

## I. BACKGROUND[1]

At the hearing on Bugmobiles's application for a temporary injunction, the trial court heard from James Kiening, the president of Bugmobiles, and Cochrum. Cochrum, who lacks a college degree, started working at Bugmobiles after working for several years selling life insurance at first, then Yamahas, and ultimately Fords. The record does not specify whether Bugmobiles apprised Cochrum of the provisions in the employment agreement before he accepted its job offer. Nevertheless, Cochrum signed an employment agreement on March 22, 2004, before starting as an apprentice technician at Bugmobiles. The employment agreement contains, among other things, non-solicitation and non-competition provisions that provide:

> 10.    Diversion of Business.    The Employee shall not, during the period of employment by the Employer and following termination of employment (whether such termination be with or without cause) either for the Employee or on behalf of any person, firm, corporation, or any other operation or entity, directly or indirectly:

---

[1] Because this is a memorandum opinion and the parties are familiar with the facts, we will not recite them here except as necessary to advise the parties of the Court's decision and the basic reasons for it. *See* TEX. R. APP. P. 47.4.

10.1 Divert or attempt to divert from the Employer any business whatsoever by influencing or attempting to influence, or soliciting or attempting to solicit any of the customers of the Employer with whom Employee may have dealt at any time or who were customers of the Employer on the date of termination of the Employee's employment or had been customers of the Employer thereto; or

10.2 Divert or attempt to divert from the Employer any person employed by the Employer by influencing or attempting to influence such person to leave Employer's employ.

11. Non-Compete Clause. For a period of two (2) years from the termination of employment, the Employee shall not, either for the Employee or on behalf of any other person, firm, corporation, or any other operation or entity, directly or indirectly own, control, or participate in the ownership or control of, or be employed by on [sic] behalf of, any business which is similar to and is competitive with the business of the Employer within a seventy-five (75) mile radius of Employer's locations in, but not limited to, Bay City, Cuero, Edna, El Campo, Goliad, Karnes City, La Grange, Luling, Palacios, Port Lavaca, Rockport, Runge, Schulenburg, and Victoria—all locations in TEXAS.

The employment agreement, Cochrum's resignation letter, one of Cochrum's paystubs from Bugmobiles, a list of Bugmobiles's customers that Cochrum serviced, and an employee handbook were admitted into evidence by the trial court during the hearing on Bugmobiles's application for a temporary injunction. Kiening testified as to Bugmobiles's employment agreement, business model, service area, training, and investments in marketing and dissemination or protection of customer lists. Cochrum discussed some of the same topics and his resignation and endeavors at Stout Pest Control.

## A. Employment Agreement

Kiening explained that Bugmobiles employs approximately twenty-five technicians,

3

and it requires that all employees, including non-technicians, sign an employment agreement that contains non-solicitation and non-disclosure provisions similar to the one Cochrum signed. Such employment agreements are, according to Kiening, common in the pest control industry.

**B.     Business Model**

Kiening characterized Bugmobiles's business model as "unique" in that it encourages employees to develop relationships with customers. Kiening posited that other pest control companies purposefully rotate technicians to avoid the development of such relationships. Cochrum echoed an emphasis on customer relationships. During Cochrum's approximately thirteen years at Bugmobiles, he helped customers by burying dogs, "fixing beds," answering their late-night phone calls, and giving one customer a TV.

**C.     Service Area**

Bugmobiles's service area extends around Austin, San Antonio, Corpus Christi, and Houston. Cochrum's service area for the approximately 300 Bugmobiles customers consisted of Calhoun, Jackson, and Matagorda counties. According to Kiening, any Bugmobiles technician may service any customer throughout Bugmobiles's territory. In accordance with this policy, Kiening recalled that Cochrum once provided service to a customer as far away as Schulenburg.

**D.     Training**

Kiening insisted that Bugmobiles's technicians received specialized training that consisted of two parts: formal education and access to experienced technicians. Each technician receives eight hours of continuing education, the state minimum, and, in

Keining's words, "a lot more than that." Kiening highlighted Bugmobiles's experienced technicians, noting that Bugmobiles's technicians may call him or one of their supervisors and say, "I have a so-and-so. Can we do it?" In response, Keining or one of Bugmobiles's "experienced technicians" would generally answer, "Yes, we can. We'll get down there and take care of it. We will show you how to do it."

Cochrum characterized Bugmobiles's training as "basic" rather than "specialized" because it primarily consisted of merely shadowing a different technician every day. Cochrum noted that "it could be different from one tech—from one technician to another, because one may do something his way. One may do it this way. One may use this. The other may use this." Cochrum commented that the continuing education programs were presented by one of the four pesticide manufacturers that supplied Bugmobiles with the pesticides that its technicians used. These pesticides are, in Cochrum's estimation, similar to but more potent than those available at retailers such as Home Depot or Lowe's.

## E.     Business Investments

Kiening estimated that Bugmobiles has approximately 20,000 customers, and he believes that it obtained these customers through marketing efforts that include social media advertising and gifts to charities. Over the past 13 years, Bugmobiles has spent $1.8 million in advertising, spending $150,000 in 2016 alone. Kiening recalled that in the last eight or nine years, none of Bugmobiles's employees have had access to its entire customer lists. However, before this period, employees may have accessed printouts listing all of Bugmobiles's customers.

## F.     Cochrum's Experience with Bugmobiles

5

A year after beginning as an apprentice, Cochrum earned a commercial and private pesticide application license from the Texas Department of Agriculture. Cochrum acknowledged that all of his training, experience, client contact, and information regarding pest control came during his employment with Bugmobiles. He also acknowledged that at Bugmobiles he relied on its advertising because his wages were based on a service commission. Cochrum could supplement his wages with a 10 percent "bonus" for generating new sales. As for compensation, the employment agreement provides:

5. Compensation. As compensation for services rendered hereunder, Employer agrees to pay the following:

| Route Commission | |
|---|---|
| Monthly Volume | Commission % |
| $0 - $6,000 | 25% |
| $6001 - $7000 | 27.5% |
| $7001-$10,000 | 30% |
| $10,001 + | 32.5% |

Sales Commission: 10% of all renewable services.

Example: Monthly Volume of $12,000 and Sales of $3,000.

| Monthly Volume | Commission % | Gross Pay |
|---|---|---|
| $0 - $6,000 | 25% | $1,500 |
| $6001 - $7000 | 27.5% | $275 |
| $7001-$10,000 | 30% | $900 |
| $10,001 + | 32.5% | $625 |
| | | $3325 |
| | | |
| Sales Total | Sales % | |
| | | |
| $3,000 | 10% | $300 |
| | | |
| | Gross Pay | $3,625 |

Employee shall be paid in installments on the tenth and twenty-fifth of each month hereafter.

Cochrum's January 2016 paystub showed a total gross commission of $3,611.38 and a net monthly income of $2,155.57, after deductions for taxes, medical and disability insurance, and retirement.

Depending on the day, Cochrum may have worked in different areas. Cochrum acknowledged that Bugmobiles was free to assign and reassign customers to different technicians. He, however, denied that he had access to the list of all of Bugmobiles's customers.

## G.    Cochrum's Resignation

Cochrum began thinking about leaving Bugmobiles about a year before his resignation. He had first met Mr. Stout[2] around 2004, and the two kept in touch. In their conversations, Stout mentioned to Cochrum, "[w]henever we get ready to retire, it would be great if we worked together." Cochrum's goal in joining Stout Pest Control was that the endeavor would allow him to take "a week off here or there" while Stout covered for him and vice-versa.

Before Cochrum joined Stout Pest Control, Stout asked him about any potential non-competition agreement. Cochrum could not recall signing a non-competition agreement and none appears in the employee handbook given to Cochrum when he began working for Bugmobiles. Stout's inquiry prompted Cochrum to ask Ricardo Salinas, another Bugmobiles technician, whether he had signed a non-competition agreement.

On Friday, February 10, 2017, Cochrum informed the first Bugmobiles customer

---

[2] Stout's first name does not appear in the record.

that he was leaving Bugmobiles and joining Stout Pest Control. Cochrum "felt [he] owed it to her, being [that] she was a good friend." On Monday, February 13, 2017, Cochrum, as Kiening recalled, told him, "Here's my keys. Here's my card. Here's my telephone. I quit. I'm going to retire, and I'm going to do things like I want—things that I want to do that I haven't been able to do while I worked." Cochrum's handwritten February 13, 2017 resignation letter provides, "I, Michael Cochrum do hereby resign my employment with Bugmobiles effectively [sic] this date. I feel it is time in my life to do things I want to do personally. I thank you for the opportunity to work at Bugmobiles." Cochrum began working at Stout Pest Control on the same date.

Upon leaving Bugmobiles, Cochrum used customer phone numbers and addresses stored on his personal cell phone, which he used for work, to contact former customers. Cochrum claimed that he would not have contacted such customers if he had known about the employment agreement. Since leaving Bugmobiles, Cochrum has provided pest control service to 47 former customers through Stout Pest Control. In the six weeks between leaving Bugmobiles and the temporary injunction hearing, Cochrum earned a gross income of $4,800 at Stout Pest Control.

## H.    Temporary Injunction

At the conclusion of the temporary injunction hearing, the trial court announced that it would grant Bugmobiles relief. In an amended temporary injunction order, the trial court found, among other things, that:

> c.    [Bugmobiles's] business model is unique insofar as it depends on recurring business fostered by technicians developing relationships over time with the clientele;
>
> . . .

8

i.      [Cochrum] has been able to use his relationship with [Bugmobiles's] clients and knowledge of [Bugmobiles's] pricing and techniques to solicit clientele from areas developed by [Bugmobiles], and has in fact solicited clientele using that knowledge;

. . . .

k.      [Bugmobiles] has a competitive edge in each area where [Bugmobiles] maintains a call center;

. . . .

n.      If [Cochrum] is not restrained from working in pest control in Calhoun, Jackson, Matagorda, and Victoria Counties, [Cochrum] will continue to do so, damaging the market [Bugmobiles] has developed and leaving no recourse or way for [Bugmobiles] to know who [Cochrum] is soliciting or what he [sic] doing;

The temporary injunction order then provides four broad restraints, which are described below.   This interlocutory appeal followed.

## II. RESTRICTIONS

Cochrum's issues implicate four of the restrictions set forth in the temporary injunction and the bond amount, discussed in the next section.   The restrictions fall into two broad categories.   The first disputed category deals with geographic restrictions, and it restrains Cochrum from:

> directly or indirectly owning, controlling, or participating in the ownership or control of, or being employed by or on behalf of, or engaging in any business which is similar to and is competitive with the business of Bugmobiles within seventy-five (75) miles of Calhoun County, Jackson County, Matagorda County, or Victoria County, Texas.

The second disputed category deals with Bugmobiles's customers, and it restrains Cochrum from:

9

- diverting any business whatsoever from Bugmobiles by influencing or attempting to influence any of the customers of Bugmobiles whom Cochrum may have dealt with at any time or who were customers of Bugmobiles on February 13, 2017 or had been customers of Bugmobiles thereto;

- soliciting or attempting to solicit any of the customers of Bugmobiles whom Cochrum may have dealt with at any time or who were customers of Bugmobiles on February 13, 2017 or had been customers of Bugmobiles thereto;

- servicing any client that was under contract with or was being serviced by Bugmobiles as of February 13, 2017 by directly or indirectly owning, controlling, or participating in the ownership or control of, or being employed by or on behalf of, or engaging in any business which is similar to and is competitive with the business of Bugmobiles.

For purposes of this interlocutory appeal, Cochrum does not contest being restrained from servicing the same customers that he serviced while at Bugmobiles and providing pest control services in his former service area (Calhoun, Jackson, and Matagorda counties) and Victoria County, where he resides. Instead, Cochrum asserts, among other things, that the prohibition on all other Bugmobiles's customers is unreasonably vague.

## A. Applicable Law

To obtain a temporary injunction, the applicant must plead and prove three elements: (1) a cause of action; (2) a probable right to relief; and (3) a probable, imminent, and irreparable injury in the interim. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002). Regarding the third element, an injury is irreparable if the injured party cannot be adequately compensated in damages or if the damages cannot be measured by any certain pecuniary standard. *Id.* "'Disruption to a business can be irreparable harm. Moreover, assigning a dollar amount to such intangibles as a

10

company's loss of clientele, goodwill, marketing techniques, and office stability, among others, is not easy.'" *Intercont'l Terminals Co., LLC v. Vopak N. Am., Inc.*, 354 S.W.3d 887, 896 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (quoting *Frequent Flyer Depot, Inc. v. Am. Airlines, Inc.*, 281 S.W.3d 215, 228 (Tex. App.—Fort Worth 2009, pet. denied) (citations omitted)).

> Texas Rule of Civil Procedure 683 provides:
>
> Every order granting an injunction and every restraining order shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail and not by reference to the complaint or other document, the act or acts sought to be restrained; and is binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise.

*See* TEX. R. CIV. P. 683.

## B.    Standard of Review

We assess the trial court's ruling under the abuse-of-discretion standard. *Butnaru*, 84 S.W.3d at 204.   The test for abuse of discretion is whether the trial court ruled arbitrarily, unreasonably, without regard to guiding legal principles, or without supporting evidence.   *Bocquet v. Herring*, 972 S.W.2d 19, 21 (Tex. 1998).   As to ruling without supporting evidence, the trial court does not abuse its discretion if some evidence in the record reasonably supports the trial court's decision.   *Butnaru*, 84 S.W.3d at 211. Under this standard, we draw all legitimate inferences from the evidence in a manner most favorable to the trial court's ruling.   *Allied Capital Corp. v. Cravens*, 67 S.W.3d 486, 489 (Tex. App.—Corpus Christi 2002, no pet.).   Also under this standard, the legal and factual sufficiency of the evidence are not independent grounds of error but are relevant

11

factors in assessing whether the trial court abused its discretion. *Stewart Beach Condominium Homeowners Ass'n, Inc. v. Gili N Proper Inv., LLC*, 481 S.W.3d 336, 343 (Tex. App.—Houston [1st Dist.] 2015, no pet.).

## C. Geographic Restrictions

Both of Cochrum's issues assert that the trial court abused its discretion in crafting the geographic restrictions. Combined, Cochrum's issues challenge this restriction on procedural and sufficiency of the evidence grounds.

Cochrum argues that the geographic restriction is overly broad geographically, insufficiently specific, and insufficiently definite so as to allow him or anyone enforcing the temporary injunction to know whether he violated it by working in a specific place. According to Cochrum, the phrase "within seventy-five (75) miles of Calhoun County, Jackson County, Matagorda County, or Victoria County, Texas" violates Texas Rule of Civil Procedure 683. Cochrum essentially argues that a cartographer would have trouble drawing the seventy-five-mile zone around the boundaries of the four counties.

Bugmobiles responds that the location and boundaries of counties in Texas are defined by public laws and that they are so definite and precise that state courts take judicial notice of them. In *Barber v. Intercoast Jobbers and Brokers*, 417 S.W.2d 154, 157–58 (Tex. 1967), referenced by Bugmobiles, the Texas Supreme Court wrote that:

> This court held as early as 1866 that a court may judicially know that the state is divided into counties, the location of the counties, their contiguity with each other and their boundaries, dimensions and extent when defined by public laws. *Wright v. Hawkins*, 28 Tex. 452, 472 (1866). In *Southwestern Investment Company v. Shipley*, 400 S.W.2d 304, 307 (Tex. Sup. 1966) this court said, 'we judicially know that Amarillo is not situated wholly within Potter County,' and in *Harper v. Killion*, supra, that a district court sitting in Cherokee County could 'judicially notice the certain and

12

indisputable fact of common knowledge that the entire city of Jacksonville is located in such county, . . . .' Note, 35 TEX. L. REV. 731. In those instances, not only the boundaries of counties but the general boundaries of municipalities within counties were judicially noticed. Facts about well known and easily ascertainable geographical facts concerning counties are frequently judicially noticed.

*Barber*, 417 S.W.2d at 157–58. Determining the outer-most boundary of the geographic restriction in the injunction is, according to Bugmobiles, "a simple matter of measuring 75 miles from each of the county's boundary."

Bugmobiles reliance on *Barber* is misplaced. First, Bugmobiles does not satisfy *Barber's* threshold for judicial notice by failing to reference, in the trial court and before us, any public law detailing the boundaries of Calhoun, Jackson, Matagorda, and Victoria counties. Second, Bugmobiles fails to explain how measuring seventy-five miles from a county's boundary satisfies Rule 638's "reasonable detail" and prohibition on referencing "the complaint or other document" requirements. *See* TEX. R. CIV. P. 683. Therefore, we conclude that the trial court abused its discretion in crafting the geographic restriction on the ground that it violates Rule 683.

Part of Cochrum's first issue and sub-issue (a) of Cochrum's second issue are sustained.[3]

## D.    Customer Restrictions

In relation to Cochrum's first issue, he also argues that:

it is impossible for [him] to comply with [the temporary injunction] because he did not have access to or knowledge of Bugmobiles'[s] customer list. He only knew his own customers. So he would not know whether he was contacting a client of Bugmobiles unless it was [one] of his own prior

---

[3] Cochrum also complains that the temporary injunction is internally inconsistent as between its finding and the seventy-five-mile zone. Our disposition eliminates the need to address Cochrum's internal inconsistency argument. *See* TEX. R. APP. P. 47.1.

customers. He therefore has no knowledge of the duties and obligations imposed on him by the order.

These arguments implicate the customer restrictions detailed above.

In response, Bugmobiles argues that Cochrum waived his complaint by agreeing to be temporarily restrained from working in pest control in Calhoun, Jackson, Matagorda, and Victoria counties. Bugmobiles also argues that the trial court was presented with two pieces of evidence supporting the customer restrictions.

There was, according to Bugmobiles, some evidence that Cochrum received a customer list that showed all of Bugmobiles's customers while he was employed at Bugmobiles. First, Bugmobiles references the cross examination by Cochrum's counsel of Kiening:

Q.     Did Mr. Cochrum ever receive a customer list that would have shown all of the customers of National Bugmobile?

A.     Yes, he has. In that length of time, we used to get the computer printouts that were, you know—and we don't do that anymore. Everything in our office is shredded. Everything. Notes. Everything.

We get cards that are left over. They're all shredded. It is confidential information. But those computer—I.B.M. computer forms went away, shoot, eight or nine years ago, sometime back. Do not use it anymore.

Q.     Okay. So as of the last eight or nine years, he's not—none of your employees had access to your entire customer list.

A.     No.

Second, Bugmobiles asserts that the evidence shows Cochrum was not limited to working only for customers in the four counties listed in the temporary injunction order. On direct examination by Bugmobiles's counsel, Kiening testified:

14

Q. Now, under that agreement, why—how many counties do you service?

A. Let's see. From Austin to San Antonio to Corpus to Houston.

Q. And in [the employment agreement], it reflects several counties that are the basis for your business, correct?

A. Yes, sir, that's correct.

Q. What are the—do you have offices in those counties?

A. No, sir.

Q. What—how do you—what is the importance of—

A. I have call logs. I have local numbers—

Q. And how does that work?

A. —in which they—our guys—some of them, they're actually in office. If it rings three times and if it's not picked up, it rolls to Victoria so a human can answer the phone.

Q. And when you have a technician—and you have 27 such as Mr. Cochrum—are they able to service accounts in any of that area that they can get accounts? Do you understand my question?

A. Yes, I do. I—they are.

Q. If you had a need for a big account up in Schulenburg, were you able to send Mr. Cochrum up there or someone like him?

A. And have, yes.

Q. And if he finds an account in Schulenburg or in Falfurrias, anywhere within the range that's on there, he can come to you and say, "Jim, I've got this account. They'll willing to pay"; and you'll let him work it.

A. Yes.

Bugmobiles's contention that Cochrum waived his complaint regarding the

15

customer list by agreeing to be restrained in the four counties makes no sense when applied to the customer restrictions. Cochrum's decision not to provide pest control services in four counties coupled with the instant appeal necessarily means that he would like to provide pest control services outside the four counties.

As for Cochrum's specificity concerns, the customer restrictions prohibit Cochrum from soliciting business from approximately 19,700 Bugmobiles customers to whom he did not provide pest control services. Drawing all legitimate inferences from the evidence in a manner most favorable to the temporary injunction, *Cravens*, 67 S.W.3d at 489, the list of all of Bugmobiles's customers that Cochrum had access to was eight or nine years old. At oral argument, Bugmobiles suggested that Cochrum merely ask prospective customers if they had previously received pest control services from Bugmobiles. We cannot accept Bugmobiles's simplistic suggestion.

In essence, Bugmobiles wants a temporary injunction without running through the paces required by Texas law. In *Super Starr International, LLC v. Fresh Tex Produce, LLC*, No. 13-16-00663-CV, 2017 WL 3084294 at *16 (Tex. App.—Corpus Christi Jul. 20, 2017, no pet.), we held that a discrepancy between testimony and documentary evidence of customers created a fatal ambiguity. In this case, there is simply no evidence identifying all of Bugmobiles's customers. Therefore, the temporary injunction as it pertains to the customer restrictions is fatally vague. *See id.*

Part of Cochrum's first issue and sub-issue (b) of Cochrum's second issue are sustained.

## E.     Probable, Imminent, and Irreparable Injury

16

In Cochrum's second issue, he argues that Bugmobiles failed to present legally and factually sufficient evidence that it would suffer a probable, imminent, and irreparable injury. Cochrum also argues that the trial court erred in balancing the equities in this case. We conclude that Cochrum's argument is inadequately briefed. *See* TEX. R. APP. P. 38.1(i) ("The brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record.").

Sub-issue (c) of Cochrum's second issue is overruled.

### III. BOND

Lastly, Cochrum complains that the evidence is legally and factually insufficient to support the $500.00 bond that the trial court set. Bugmobiles argues that Cochrum failed to preserve his challenge to the bond amount. The record does not show, as Bugmobiles contends, that Cochrum made or filed any objections in the trial court to its setting the bond as it did. Therefore, this sub-issue has not been preserved for appeal. *See* TEX. R. APP. P. 33.1; *Ex parte Coffee*, 328 S.W.2d 283, 292 (Tex. 1959); *Matagorda County Hosp. Dist. v. City of Palacios*, 47 S.W.3d 96, 104 (Tex. App.—Corpus Christi 2001, no pet.); *Speedman Oil Co. v. Duval County Ranch Co.*, 504 S.W.2d 923, 931 (Tex. Civ. App.—San Antonio 1973, writ ref'd n.r.e.).

Sub-issue (d) of Cochrum's second issue is overruled.

### IV. CONCLUSION

We modify the temporary injunction to restrain Cochrum from:

- directly or indirectly owning, controlling, or participating in the ownership or control of, or being employed by or on behalf of, or engaging in any business which is similar to and is competitive with the business of Bugmobiles ~~within seventy-five (75) miles of~~ <u>in</u>

17

Calhoun County, Jackson County, Matagorda County, or Victoria County, Texas.

- ~~diverting any business whatsoever from Bugmobiles by influencing or attempting to influence any of the customers of Bugmobiles whom Cochrum may have dealt with at any time or who were customers of Bugmobiles on February 13, 2017 or had been customers of Bugmobiles thereto~~;

- <u>diverting any business by</u> soliciting or attempting to solicit any of the <u>approximately 300</u> customers of Bugmobiles whom Cochrum ~~may have~~ dealt with <u>at the time of his resignation from Bugmobiles</u>~~at any time or who were customers of Bugmobiles~~ on February 13, 2017 ~~or had been customers of Bugmobiles thereto~~;

- ~~servicing any client that was under contract with or was being serviced by Bugmobiles as of February 13, 2017 by directly or indirectly owning, controlling, or participating in the ownership or control of, or being employed by or on behalf of, or engaging in any business which is similar to and is competitive with the business of Bugmobiles~~.

The temporary injunction is affirmed as modified.

LETICIA HINOJOSA
Justice

Delivered and filed the
11th day of January, 2018.