EDWARDS et al. v. WEST TEXAS HOSPITAL et al.

No. 4504.

Court of Civil Appeals of Texas. Amarillo.

Dec. 2, 1935.

Rehearing Denied Jan. 13, 1936.

Vickers, Campbell & Evans, of Lubbock, for appellants.

McWhorter & Howard and Bledsoe, Crenshaw & Dupre, all of Lubbock, and Seay, Malone & Lipscomb and Touchstone, Wight, Gormley & Price, all of Dallas, for appellees.

HALL, Chief Justice.

E. P. Edwards, joined by his three minor children and his mother-in-law, Mrs. T. C. Hollander, filed this suit against the West Texas Hospital, alleged to be a corporation, Dr. C. J. Wagner and Dr. Anne West, a feme sole, to recover damages alleged to have been sustained by plaintiffs on account of malpractice and negligence of the defendants which resulted in the death of Mrs. Vergie Edwards, the wife of E. P. Edwards, the mother of his three minor children, and the daughter of Mrs. T. C. Hollander.

A jury had been impaneled, but, after plaintiffs had closed in the introduction of their testimony, the court directed a verdict in behalf of the defendants.

The petition of the plaintiffs is unusually lengthy, but the material facts we briefly state as follows:

On and prior to February 8, 1834, Mrs. Vergie Edwards was pregnant with twins, and on that date Dr. Anne West, as her attending physician, delivered her of one of the children, but did not deliver the other. The child which was born in the regular way is one of the plaintiffs in the suit. Immediately after the birth of the first child, some neighbors, lady friends of Mrs. Edwards who were present at the time of her confinement, noticed a "large mass or knot" in the upper part of her abdomen, which, it was subsequently ascertained, was another fetus. In the course of a few hours this fetus had changed position and was in the lower part of the abdominal or pelvic cavity.

On the 10th day of February, two days thereafter, Mrs. Edwards was brought twenty-two miles from her home to the West Texas Hospital at Lubbock for diagnosis and treatment, and arrangements were made for her to remain as a patient. It is alleged that Dr. C. J. Wagner was an official and director and chief of the staff of physicians who practiced at said hospital, and that he assisted in the management of it.

She remained at said hospital, under the supervision, treatment, and care of the defendants for eleven days, during which time Dr. West visited her two or three times. The treatment prescribed and administered consisted of enemas, hot packs on her abdomen, and sedatives. The mass in her abdomen and the swollen condition of her body was very noticeable, and her suffering was intense.

Defendants diagnosed her trouble as inflammation, tumor, locked bowels, and gas on the stomach. Her condition, while in the hospital for eleven days, did not improve, but, as stated by some of the witnesses, became worse from day to day. At the end of that time she was removed to her home, and was told by Dr. Wagner that such treatment should be continued and for a nurse to be procured. She remained at home about one week, during which time Dr. Anne West continued to treat her, and called to see her at least twice.

On the 3d of March thereafter she was brought to the Lubbock Sanitarium, at Lubbock, Tex., and it was decided to be a case requiring immediate surgery, but, on account of her condition, she had to be toned up, and the operation was not performed until the morning of March 4th, at which time more than a gallon of pus and liquid was drained from her abdomen and the dead fetus was discovered and removed. It was also shown that the uterus had been ruptured. The fetus was in a badly decomposed condition, and she remained in the hospital for about a week and died on March 11, 1934.

It was shown the hospital had an X-ray machine, and at least two of the doctors testified that an X-ray examination of Mrs. Edwards would have shown whether the patient was afflicted with a tumor or that there was a fetus in her abdomen; provided the fetus was over four and one-half months of age. The fetus had apparently lived during the full period of gestation, and it was removed by opening the abdominal wall; there being no other means for its delivery than a surgical operation. The testimony further tends to show that the fetus was a female, fully developed and ready for parturition on February 8th.

It is alleged that Mrs. Edwards was the patient of each and all of the defendants; that a partnership existed between them; that an X-ray and laboratory test, as well as a proper and skillful examination, would have disclosed her condition and the nature of her affliction; that her death was due to negligence of the defendants, and each of them, in not knowing or discovering the nature of the trouble, and in failing to remove it by surgical operation; that an ordinarily careful, prudent, and skillful surgeon in the vicinity of Lubbock would have discovered and known the nature of her affliction, and would have performed all things necessary to relieve her. The failure to make an X-ray examination and a proper laboratory test are charged as two of the acts of negligence.

The hospital answered, denied its relation to any physician who treated Mrs. Edwards, admitted that it had a complete X-ray machine and necessary equipment for examining and treating of patients, and that Mrs. Edwards was in its hospital for diagnosis and treatment. It alleged that it was an incorporated hospital, and as such merely undertook to furnish reasonable accommodations for the sick and afflicted; that it furnished to its patients physicians and surgeons, rooms, beds, linens, foods, trained nurses, operating rooms, X-ray equipment, and other necessary and suitable facilities. It denied that it had ever undertaken to diagnose or treat patients, or to practice either medicine or surgery, merely seeking to furnish such means and facilities as might be required by attending physicians and surgeons. It further specially denied that it was ever employed to diagnose or treat Mrs. Edwards, or ever undertook to do so. It denied that its codefendants, Drs. Wagner and West, were acting for it in any capacity in such diagnosis and treatment rendered, but alleged they were following their own independent callings in so doing; that the only relationship which existed between the hospital and the two doctors was that which usually and customarily exists between any physician and patient and hospital in which the patient is being treated. The allegation of the existence of a partnership was denied by verified plea.

Dr. West admitted her relationship to Mrs. Edwards as being that of physician and patient, alleged that she diagnosed Mrs. Edwards' trouble as ovarian tumor and had her brought to the defendant hospital for diagnosis and treatment by it and its doctors and nurses, and in particular by Dr. Wagner of said hospital. She alleged that she gave her codefendants a complete history of Mrs. Edwards' condition of health as it had been observed by her, and as related to her by Mrs. Edwards and her husband. She admitted in her allegations that she did not know that Mrs. Edwards had a fetus in her abdomen, but did allege that she used ordinary skill, care, prudence, and diligence to ascertain her condition and in having her brought

to the hospital and its doctors and nurses, and further alleged that Mrs. Edwards had informed her that she was operated upon for ovarian tumor several years prior to the time in question.

Dr. Wagner answered by general demurrer, denials, admitted that Mrs. Edwards was brought to him, that he made a physical, manual examination of the body of Mrs. Edwards for the purpose of ascertaining the cause of her condition and diagnosed her case, using all the means which in his opinion and best judgment as a physician and surgeon were necessary to determine, diagnose, and ascertain the cause of her suffering and ailment. He did not allege what his diagnosis was other than that he did not believe an immediate operation upon her was necessary, and that such an operation would have resulted either in her death or endangered her life.

The appellants present the contention in several propositions that the court erred in directing a verdict because the testimony raised the issue that the appellees failed to properly diagnose the case, prescribed treatment for inflammation, tumor, and locked bowels, which constitute negligence, in view of other testimony showing that an X-ray examination would have disclosed that there was a fetus in her abdomen, and that she had no tumor.

There was an X-ray machine in the hospital which could have been used and which the appellees failed to use. The testimony further shows that Dr. West, who attended Mrs. Edwards during the parturition and delivered her of the first child on February 8, 1934, continued, and promised to continue, to treat her in the hospital, and saw her twice after she was removed to the hospital; that Dr. West had told them several times that she thought Mrs. Edwards would have twins; that Dr. West also observed the knot or lump in the upper part of Mrs. Edwards' abdomen immediately after the birth of the first child and remarked that there might be a tumor; that, in discussing Mrs. Edwards' condition with some of Mrs. Edwards' neighbor women during the confinement, some opinion was expressed that Mrs. Edwards would probably be delivered of twins instead of one child. Edwards said that with the first delivery the afterbirth was not like that with their other children, and that "it had more blood and stuff in it"; that on the night after the

birth of the baby on the morning of the 8th Dr. West returned and said: "Mrs. Edwards has locked bowels; we will have to give her an enema and if she is not better in the morning might have to take her to a hospital"; that Dr. West brought the patient to the hospital on the 10th of February; that it was first contemplated by Edwards and his wife she should go to the Lubbock Sanitarium instead of the West Texas Hospital, but finally went to the latter hospital at the instance and suggestion of Dr. West; that upon arrival at the hospital Mrs. Edwards was immediately taken charge of by the nurses of the institution and carried into the hospital.

Mrs. Lee, a neighbor of the Edwards, who accompanied Dr. West and Mrs. Edwards to the hospital, said she saw Dr. Wagner and Dr. West talking, and that Dr. Wagner said to Mr. Edwards, "Go and make financial arrangements with the hospital and then we will do everything we can for her, and we hope to have her all right in a few days." Mrs. Lee was asked the direct question if she 'phoned Dr. Wagner before their arrival with Mrs. Edwards at the hospital, and she replied that Dr. West said that she stopped and 'phoned to make an appointment with the hospital, and not Dr. Wagner, to receive Mrs. Edwards; that no particular doctor was mentioned at the West Texas Hospital; and that she had previously agreed to take Mrs. Edwards to the Lubbock Sanitarium.

Edwards testified: That, when he reached the hospital he found Drs. West and Wagner together, and before they said anything to him they went into a back room and talked a while, and that when Dr. Wagner returned he told Edwards that his wife was in a bad condition and to make financial arrangements and "we will do all we can for her," and he was directed by Dr. Wagner to see the business manager. That he went to the business manager, McLarty, and, after talking with him, Edwards was asked to step out until McLarty could confer with Dr. Wagner. He was recalled after twenty or thirty minutes, and the business manager said to him: "Your wife is in an awful bad condition, and we are going to take her and do all we can for her," and then asked, "Can you pay us anything?" and, when Edwards said "No," McLarty had him sign a note for $45, saying that they did not know all they were going to do, but he

could sign the note and get up some money in the meantime. That after the note was given Dr. Wagner went into the room and gave some directions as to the treatment, and directed that hot packs be placed on the patient's stomach and abdomen, and that she be given hypodermics. That in a day or two, when Edwards was present, Dr. Wagner came, removed the pack and said to keep up the treatment, that there was inflammation, which was the reason he was keeping the hot packs on her abdomen for the purpose of relieving the swelling. That at different times Dr. Wagner, in speaking with him, said that his wife was improving, and "we will just keep this up. I think she will be all right."

The testimony shows, however, that her condition became steadily worse, and the swelling increased from day to day.

Edwards testified that Dr. Wagner said that inflammation was the cause of the swollen condition of her abdomen, and that she also probably had a tumor; that, when they were ready to take Mrs. Edwards from the hospital to her home, Dr. Wagner directed them to keep the hot packs on for two or three days, and that "in two or three weeks this will go back all right," referring to the swelling; that, when they were ready to leave, the business manager would not permit them to check out without ascertaining the amount of Dr. Wagner's fee, and said that the doctor had not sent in to him any fee, and he told the nurse to get them, and shortly thereafter the witness executed a note for $27, payable to Dr. Wagner, in addition to a new note made to the hospital in the sum of $87.50, and he was required to sign such notes before he was permitted to remove his wife from the hospital. The witness further testified that he never had any conversation with Dr. Wagner with reference to what the latter's charges would be, and he talked only with the manager of the hospital in making financial arrangements.

Dr. J. H. Stiles and Dr. Key, of the Lubbock Sanitarium, both described Mrs. Edwards' condition when she was brought from her home to their sanitarium on March 3d. They described the operation early the next day in which the fetus was removed from her abdomen, together with about a gallon of pus and fluid, and on cross-examination Dr. Stiles was asked whether or not the fetus which had been removed was ectopic or one formed in the Fallopian tubes. Dr. Stiles testified that there was no sign of ectopic pregnancy; that there was an opening or rent in the wall of the womb through which the fetus had passed from the womb into the abdomen and it was his opinion that a long time had elapsed since its death, and that it died when the uterus was ruptured; that decomposition of the fetus had set up; that an operation was the only hope of removing the child and saving the life of the mother.

Edwards testified that, when the doctors lifted the baby out of the abdomen of his wife, they laid it on her side and cut the naval cord, and that the baby was dead and in an advanced state of decay; that it was a girl, normal in every way, but had turned blue; that it was of the same size as its twin sister born on the 8th of February prior thereto.

The court concluded that this testimony was not, as a matter of law, sufficient to raise the issue of negligence and malpractice, and upon motion made by appellees directed a verdict in their favor. We think this was error.

By their first contention the appellees insist that the owner of a hospital, whether an individual, firm, or corporation, is not liable for damages resulting from diagnosis and/or treatment, medical or otherwise, in said hospital, when such diagnosis and treatment were rendered by physicians employed by the patient or some one other than such hospital, and that damages resulted from the alleged negligence of such physicians.

It is true there is no testimony which would have authorized a jury to conclude that Dr. West was in any way connected with the hospital, but the stationery used by the hospital authorities showed that Dr. Wagner was the head of the hospital staff of physicians and surgeons, and the testimony which we have briefly outlined above showing that the business manager referred financial matters to Dr. Wagner, took the note for his fees, as well as note for the hospital fees and expenses, and the various statements by Dr. Wagner and the business manager as to what "we" would do or endeavor to do, together with other facts, tended to show a business connection between Dr. Wagner and the hospital. No testimony was offered directly upon the question, and, although there was a sworn denial of partnership, we think the evidence was sufficient to have required the

trial court to submit that issue to the jury. Parties may be bound as partners as to third parties in the absence of a partnership agreement. Moreover, the hospital might be liable if Dr. Wagner was its agent.

■ By their second proposition the appellees insist that, before there could be a recovery against them, there must have been legally sufficient pleadings charging that the hospital undertook to diagnose and treat the condition of Mrs. Edwards, that it was guilty of specific acts of negligence in the diagnosis and treatment, and that such acts resulted in damages.

If a partnership relation existed between the hospital and Dr. Wagner, or the evidence showed a joint undertaking, the hospital could be charged, and we think the pleadings are sufficient to support testimony upon that issue.

The petition was excepted to as being insufficient upon this ground, but they were overruled. If in fact the petition is insufficient and the plaintiffs went to trial relying on the correctness of the court's ruling, they are entitled to have the judgment reversed and the cause remanded in order that they may amend their pleadings.

■ By several propositions the appellees insist that the court correctly directed a verdict because there was no testimony from any physician or surgeon or other witness qualified to testify as an expert that any act done or any failure to do anything on the part of the appellees was negligence. It is true that, in the absence of evidence to the contrary, the law indulges the presumption that a physician has discharged his duty with reasonable care and skill in his diagnosis and treatment, but we do not subscribe to the doctrine that mere proof of bad results is no proof of negligence in any case, and that the issue of negligence is one for experts only to determine.

■ It is also true, as asserted by appellees in their seventh counter proposition, that, where due care, diligence, judgment, and skill are exercised, a mere failure to diagnose correctly does not render a physician or surgeon liable. While it may be the rule in some jurisdictions that it takes more than the opinion of one or more physicians to the effect that the treatment followed in a given case should have been different to lay a foundation for malpractice, we do not understand that to be the rule in this state.

■ The sum and substance of appellees' contention is that, because there was in the present case no expert evidence as to what method or means in the exercise of ordinary care and skill should have been employed to determine the presence or absence of the second fetus in the abdomen of Mrs. Edwards, and because no expert has testified that the appellees were guilty of negligence, there has been a failure of proof because, as to what is or is not, the proper practice is a question for experts, and can be established only by their testimony. Two experts testified that the use of the X-ray would have shown that the supposed tumor was a fetus. Whether the failure to use it was negligence was a question for the jury.

They further insist that the uniform holding of the courts is that it cannot and should not be left to a jury to speculate whether or not the experts in the practice of their profession have pursued the proper course of procedure.

We do not agree that the law is as stated by appellees. The Constitution, article 1, § 15, provides that the right of trial by jury shall remain inviolate. We think there are questions of fact in this case which should have been submitted to the jury.

The undisputed proof is that there was a rent or opening in the uterus at the time the dead fetus was removed from the abdomen. There is some testimony to the effect that the wall of the uterus was ruptured at the time of parturition. The fetus was in an advanced stage of decomposition, had turned blue, and this, with the fact that it was fully developed and was of the same size and apparent weight of the child that was delivered alive, might be circumstances upon which the jury would determine that the uterus was ruptured some time during the period of labor, which lasted from about 6 o'clock in the afternoon until 7 o'clock the next morning. There is no testimony which tends to account in any way for the fact that the uterus was ruptured. This rupture could not, in the nature of things, have been the result of an ectopic pregnancy. One doctor testified that, in cases of ectopic pregnancy or conception in the Fallopian tube, the period of gestation would not be more than about four or five months, when it would become necessary

to remove the fetus through the abdominal wall. Dr. Styles stated that there was no evidence of an ectopic pregnancy.

There is testimony to the effect that there were symptoms of a ruptured uterus or excessive loss of blood, paleness of the patient, etc. Edwards testified that, when the first of the twins was delivered, the placenta was not like those which were taken after the birth of their other three children, but that this placenta had more "blood and stuff" in it than the afterbirths on any former parturition.

The unexplained presence of a ruptured uterus, the excessive amount of blood in the placenta, and the failure of any evidence tending to show a ruptured Fallopian tube, together with the testimony of some of the doctors that the fetus had died at the time the uterus was ruptured, and the further fact that immediately after delivery of the first child what proved to be the fetus remained in the upper part of the abdominal cavity and within a few hours was found lower down, in or near the pelvic cavity, thus being inconsistent with the theory that it was an ovarian tumor, are all circumstances from which the jury might have concluded that some one had been guilty of negligence. The jury might have concluded that the appellees failed to sustain their theory of an ectopic pregnancy of one fetus and a uterine pregnancy of the other. The jury has the right to weigh the testimony of experts and to accept or reject all or any part of it at their option.

We think the testimony is sufficient to raise the issue of whether there was negligence in failing to make an X-ray examination of the patient between the time she was carried to the West Texas Hospital and the time she was removed to her home.

We have no quarrel with the doctrine that expert testimony is admissible upon the issue of whether the proper care, skill, and diligence has been exercised in diagnosing and treating patients, but in the following cited cases in this state it is shown that the question of whether the degree of care, skill, and diligence as disclosed by the testimony is negligence is the prerogative of the jury. Appellees cite the case of Taylor v. Shuffield (Tex.Civ.App.) 52 S. W.(2d) 788, but we find that the Supreme Court, 83 S.W.(2d) 955, has reversed the Court of Civil Appeals and affirmed the judgment of the trial court. The issues in that case were submitted to a jury. Malpractice was charged, the result of the operation was shown, and issues of fact similar to the facts in this case raising the question of negligence were submitted to, and passed upon by, the jury.

The case of Turner v. Stoker (Tex.Civ. App.) 289 S.W. 190, 194, involved the issue of the negligence of a physician in failing to advise the use of an X-ray to discover whether the patient had any broken bones, and is a case in point. The evidence, pro and con, was submitted to a jury. Ridgell, Justice, said: "While the appellant was not bound to diagnose carefully or know that which could not be seen, for many of our ailments are hidden, yet the fact that he did not advise an X-ray, did not discover the broken jawbone, and was guilty of other failures as detailed by the witness, was sufficient for the jury to conclude that he was negligent." (Writ of error refused.)

In the instant case it was shown that, when Dr. Anne West brought her patient to the West Texas Hospital, she gave Dr. Wagner a history of the case and of her patient. Three of the ladies who were Mrs. Edwards' neighbors, and who were present during the hours of labor and had talked with Dr. West several days beforehand testified that Dr. West said she expected that Mrs. Edwards would give birth to twins, and it appeared that before the first child was delivered there was a conversation between Dr. West and Mrs. Edwards, and Mrs. Hilton testified that, when Mrs. Edwards was in labor, and suffering, something was said about Dr. West and Mrs. Edwards "working on halves," and, if there were two children, Dr. West would get one and Mrs. Edwards would get the other.

We find upon investigation that such questions of fact are uniformly submitted to juries in this state, from which they are permitted to determine whether there has been negligence and malpractice. Moore v. Ivey (Tex.Civ.App.) 264 S.W. 283; Thorning v. Boriski (Tex.Civ.App.) 283 S.W. 912; Ford v. Couch (Tex.Civ.App.) 16 S.W.(2d) 869; Hamilton v. Harris (Tex.Civ.App.) 223 S.W. 533; Lee v. Moore (Tex.Civ.App.) 162 S.W. 437; Humphreys v. Roberson (Tex.Com.App.) 83 S.W.(2d) 311.

In view of another trial, we suggest that material testimony was excluded upon objection of appellees, which was ad-

missible under the rule of res gestæ. Res gestæ has been defined as those circumstances which are the automatic and undesigned incidents of a particular litigated act, and which are admissible when illustrative of such act, and further defined as "the whole of the transaction under investigation and every part of it." Res gestæ is considered as an exception to the hearsay rule. In its operation it renders acts and declarations which constitute a part of the things done and said admissible in evidence, even though they would otherwise come within the rule excluding hearsay evidence or self-serving declarations. The rule is extended to include, not only declarations by the parties to the suit, but includes statements made by bystanders and strangers, under certain circumstances.

While Edwards was upon the stand, he undertook to testify as to a colloquy between himself, his wife, and Dr. West the day before Mrs. Edwards was taken to the hospital. His counsel interrupted with this question: "Just before getting to that, state about your wife's enlargement as compared to the other children she had had delivered." Appellees' counsel objected upon the ground that it was "more medical testimony from a non-expert witness." The court overruled the objection, and Edwards testified that she was much larger than she had ever been with any of the other children. His counsel then asked him: "Did you see or determine any movement?" This was answered in the affirmative, and, upon motion of appellees' counsel, the court excluded the question and answer from the consideration of the jury. We think this testimony was admissible.

Edwards had testified that, after his wife returned to her home from the hospital, her abdomen continued to swell. This testimony was objected to by the attorney for the West Texas Hospital and Dr. Wagner upon the ground that it was hearsay. Plaintiffs' counsel remarked that, if negligence on the part of defendants is established, it becomes material as to what followed the negligence, and he thought it was admissible upon that theory. The court said: "Yes, sir, but also that cannot be considered by the jury as against them at this time." We think that Edwards' testimony was a statement of a fact, which a nonexpert could make, and that it was proper for the jury to consider it.

Edwards had stated that he was present in the Lubbock Sanitarium when the last operation was performed upon his wife, and, referring to the surgeons, said: "They commenced to pump this (pus) out and pumping it in a jar there, and there was about a gallon of this that they pumped out. After they pumped out he reached down in there and said, 'Here is another baby,' and they took it out."

Appellees' counsel objected to the testimony as hearsay as to the appellees. The statement was made by Dr. Krueger. The record shows that plaintiffs had not succeeded in securing the attendance of Dr. Krueger. We think it was admissible under the res gestæ rule.

When asked to describe the condition of the baby after it had been removed from the mother's abdomen, Edwards said it was blue looking, and seemed to be in a state of decay. Upon objection of appellees' counsel without stating the grounds of his objection, the court sustained it, and requested the jury not to consider the witness' answer. We think this was error.

It seems that, upon the suggestion or direction of Dr. West, the destination of Mrs. Edwards was changed from the Lubbock Sanitarium to the West Texas Hospital just about the time they reached the city limits. Edwards followed Dr. West, who was taking his wife, and Mrs. Lee, who was carrying the baby, about ten minutes later, and, thinking that his wife had been carried to the Lubbock Sanitarium, went over there. Mrs. Lee had left the West Texas Hospital to look for Mr. Edwards, and met him and told him that his wife was at the West Texas Hospital. This was objected to because neither Dr. Wagner nor Dr. West were shown to be present. The testimony is of very little probative value, but was admissible under the res gestæ rule nevertheless. The court erred in sustaining the objection.

Mrs. Lee was describing the occurrences at the time they reached the hospital. In response to a question she had said: "Before we left the nurses came and got Mrs. Edwards and carried her to another room and lifted her off this rolling bed and put her on another bed, and one of the nurses came in there and said—" By objection appellees' counsel cut off further statement upon the ground that any statement by the nurse not shown to have had authority to bind either defend-

ant was inadmissible. The record does not show what the answer of the nurse would have been, but the objection is entirely too broad. The nurse in charge of a patient may make numerous statements that are admissible.

■ It appears that Dr. Olan Key entered the operating room while the dead fetus was being removed from the abdomen of Mrs. Edwards. He testified as follows:

"Well, when one of the doctors removed the placenta or after-birth, which is the remaining portion of pregnancy, and that was bound down, they described it, by adhesions to the things there in the abdominal cavity."

"Q. Was it found there that the uterus or womb had a rent in it?

"Appellees' counsel: Unless he knows that, we object to it.

"Q. If you know.

"Appellees' Counsel: Unless the witness personally made the examination and knows the condition, it would be hearsay, based on the statement of one or the other of the physicians present, and hearsay as to us."

The court sustained the objection.

Afterward Dr. Key testified that he made the examination himself during the operation. The testimony of Dr. Key as to what Dr. Krueger had said was excluded upon the ground that it was hearsay.

Because we think certain testimony tended to establish the fact of partnership or business relation between the appellees, or some of them, and for the further reason that evidence was admissible upon the issue of negligence as shown by the failure of the appellees to make an X-ray examination, and because there is some evidence tending to show that there was no ectopic pregnancy, but that the fetus was expelled from the womb in some way during labor, the court erred in directing a verdict.

The judgment is therefore reversed, and the cause remanded.

### On Motion for Rehearing.

The principal question in this case is as to the sufficiency of the evidence to entitle the appellants, plaintiffs below, to have the case submitted to the jury upon special issues.

In our original opinion, we held that the court erred in directing a verdict, and, after another careful review of the statement of facts and pleadings, we are more firmly convinced that the court erred than we were when the original opinion was written.

We are charged with indulging in a number of expressions in the original opinion which could easily prove to be misleading and confusing to the Supreme Court in the event an application for writ of error should be presented to that court. They charge that we have stated facts that are not in the record, that we have misrepresented and misquoted, and that some of our conclusions and findings are absurd, i. e., nonsensical, and have no basis in the evidence. We had no such intention in writing the original opinion, but were prompted only by an earnest effort, after frequent consultations, to correctly decide the issue in the light of the pleadings and evidence, and we are still of the opinion that we succeeded.

It is the perogative of the appellees to challenge and question any expression or any part of our opinion which they think is at variance with the facts, pleadings, and the law, and we appreciate any sincere effort of counsel to help us correct our errors, provided they do not go to the extent of misquoting or misrepresenting these matters for the purpose of laying a predicate for an application for a writ of error.

That this case is teeming with absurdities, etc., cannot be denied, but we think they nearly all, if not all, appeared before the case reached this court. We will now endeavor to point out some of them.

The first expression which they "assail" as "being absolutely without any foundation in the evidence" is this: "On the 10th day of February, two days thereafter, Mrs. Edwards was brought twenty-two miles from her home to the West Texas Hospital in Lubbock for diagnosis and treatment, and arrangements were made for her to remain as a patient."

If there is a word in that statement which is not fully sustained by the combined record, appellee failed to point it out. The complaint is that, if this Court merely finds that Mrs. Edwards was brought into Lubbock to the West Texas Hospital for diagnosis and treatment by some doctor, and arrangements were made for her to remain in the West Texas Hospital as the patient

of that doctor, the appellee has no fault to find with the statement, and insists further that, if we intended to hold that she was placed in the hospital for diagnosis and treatment by the institution as such, and that arrangements were made for her to remain as its patient, then the statement is "absolutely without any foundation in the evidence."

█ We stand squarely upon the statement as made in the original opinion. Appellee's insistence that she could not be the patient of the hospital is at variance with every judicial definition of the word "patient" which we have been able to find. A "patient" is defined as "one who has been committed to the asylum and has remained there * * * for care and treatment," Aldrich v. Barton, 153 Cal. 488, 95 P. 900, 904; and, where a mother returned to a hospital for treatment of conditions resulting from childbirth, and the baby was taken to the hospital with her for nourishment, the baby was a patient in the hospital. Ford Hospital v. Fidelity, Etc., Co. of New York, 106 Neb. 311, 183 N.W. 656.

In its answer the hospital alleges that its "sole and only connection with the case of the deceased was to furnish such facilities as are usually and customarily furnished by hospitals to the patient of a physician or surgeon who might see fit to place such patient in its hospital; * * * and this defendant in no manner attempted to interfere with or participate in such diagnosis and/or treatment but merely undertook to render such facilities available to them and such services available to them as are usually and customarily furnished by a hospital to the attending physician or surgeon with regard to any patient that might be in said hospital."

Although this allegation appears in substance several times in the answer, appellee was careful not to specify what facilities and services available to them were rendered Mrs. Edwards, but makes the general statement that such facilities and services as are usually and customarily furnished by a hospital were rendered in this case.

The record is sufficient to sustain a finding by the jury that Mrs. Edwards was the patient of both doctors and the hospital.

The appellee next assaults the following: "She remained at said hospital, under the supervision, treatment and care of the defendants for. eleven days, during which time Dr. West visited her two or three times."

The principal effort on the part of this appellee throughout the trial, as clearly shown by the record, was to divorce itself entirely from any act of omission or commission which the testimony might have shown resulted in the death of Mrs. Edwards, and, Pilate-like, in this motion the hospital still seeks to wash its hands of all liability; but it cannot deny the fact that the nurses, X-ray machine, hot packs, hypos and syringes constituted parts of its "facilities." It is a matter of common knowledge that it is the duty of the nurse to keep what is called a "patient's chart," showing at stated intervals the condition of the patient as to temperature, respiration, pulse, etc. It is further a matter of common knowledge that the attending physician depends upon the fidelity of the nurse and the correctness of this record for his prognosis. It is further the duty of the nurse to administer such nourishment as the attending physician directs, and administer or apply such remedies, externally, hypodermically, intravenously, or per orum, as the attending physician directs. To that extent the hospital, through its nurses, supervised the treatment and care of Mrs. Edwards during the eleven days she was in the hospital. We did not find specifically that the hospital as a legal entity diagnosed the case or that it was its duty to do so, but it was the duty of its nurses, through the instrumentality of its "patient's chart," to keep a basis for its doctor's diagnosis, and to that extent, which is certainly no mean duty, the hospital participated in the treatment and care of Mrs. Edwards, and this without regard to the nourishment, the administration of medicine, application of hot packs, and other incidental duties which devolved upon the hospital and not the doctor. Who can say that correctly keeping the chart is not caring for the patient? And can it be denied that nourishing the patient, the application of hot packs, the giving of enemas, and the administration of sedatives and other remedies, externally or internally (all of which duties usually devolve upon the nurses), is not treatment? We think the jury would have so decided. Any other decision might be absurd.

There is certainly abundant. testimony which tends to show that Mrs. Edwards

was the patient, not only of Drs. West and Wagner, but of the hospital, and that all three defendants so considered her. Upon arrival of Mrs. Edwards at the hospital, accompanied by Dr. West, Drs. Wagner and West went into a back room and held a consultation for some time. They then returned to where Edwards and his wife were, and promptly made an X-ray of Mr. Edwards' pocketbook and assets by Dr. Wagner's saying to him: "We find your wife in an awfully bad condition, and if you can make arrangements with the hospital we will do all we can for her—financial arrangements with the hospital. Can you pay some fee any way?" Edwards replied: "I haven't any money. I can't pay anything now." Dr. Wagner then said: "You will have to see the business manager," and told Edwards where to go. Mrs. Lee also testified to having heard the conversation between Dr. Wagner and Edwards.

Edwards then testified that he found the business manager who inquired: " 'Can you pay us anything?' and I says, 'No, I will have to give you a note.' He says, 'We can't handle it that way.' I says, 'I have no money. I can't pay anything now. I will try to get some.' He says, 'You step out until I talk to Dr. Wagner,' and I stepped outside the room."

He further testified that after about twenty minutes the outside clerk called him in where Dr. Wagner and McLarty (the business manager) were, and McLarty said: "Your wife is in an awful bad condition and we are going to take her and do all we can for her. You can sign a note here for $45.00."

After some remarks were made concerning the baby, McLarty said: "Of course, we don't know what all we are going to do to her, but you can sign the note now and in the meantime see if you can get us some money."

We might say, parenthetically, that they succeeded in getting a good exposure.

Whether Dr. West was involved in the matter, and was acting in conjunction with the hospital and Dr. Wagner in treating their joint patient, should have been submitted to the jury, regardless of the issue of partnership.

Both Edwards and his wife expressed a desire to go to the Lubbock Sanitarium, and left home, according to the record, with that intention, but, when they reached the suburbs of Lubbock, Dr. West telephoned some one at the defendant hospital and took Mrs. Edwards there. Edwards had followed his wife, Dr. West, and one of Mrs. Edwards' neighbors, a Mrs. Lee, to town, but he was several miles behind them and went to the Lubbock Sanitarium, expecting to find them there. The jury might have believed that Dr. West arbitrarily took the patient to the defendant hospital. She visited her several times, and consulted with Dr. Wagner frequently.

While Edwards finally made one note to the hospital for its services, room, etc., and a separate note to Dr. Wagner for his compensation, the last note, like the first, was taken by the business manager of the hospital when they decided to take Mrs. Edwards back to her home, and he said several times that note was "for our doctor's fees." According to Edwards' testimony, the manager of the hospital refused to permit her to be carried away until Edwards had made satisfactory financial arragements with both the hospital and Dr. Wagner.

Speaking of absurdities—exactly why the manager of the hospital should in effect assert that the hospital had a pledgee's lien upon the person of Mrs. Edwards and would hold her in pawn until "our doctor's fees are paid" is not clear if the doctor and hospital were acting independently. The day Mrs. Edwards left the hospital, the manager asked the office girl, "What about our doctor's fees?" She replied, "Dr. Wagner hasn't sent them in yet."

The frequent use of the words "we," "us," and "our," by Dr. Wagner and the business manager of the hospital, and the interest manifested by each in securing the fees due the other, tend to refute the insistence so vehemently made by movant that there was no connection between Wagner and the hospital, but that they each acted independently of the other. Appellee brands our statements on this issue as "absurd"; that is, nonsensical. That may be true, but so many absurd things have been said and done before this case reached us that one more absurdity will make no difference.

A statement of Edwards' account appears in the statement of facts. It is headed, "Statement West Texas Hospital." After the names of the business manager and the superintendent of nurses, there ap-

pears a list of eleven M. Ds. Dr. Wagner's name heads the list.

It is our observation that in all parades the chief rides at the head of the column. In emblazoning its stationery with the list of medical talent (presumably all doctors of skill and ability), why was Dr. Wagner placed at the head? They were not arranged alphabetically, because, if this had been done, Dr. Wagner would have "tailed the herd." If the eleven doctors were not the medical staff of the hospital, why go to the expense of printing their names on its stationery? The names of Drs. Key, Stiles, Krueger, and Clark are not on it.

We are severely criticized for saying that Dr. Wagner was chief surgeon. We humbly confess that we find no direct evidence to that effect. In the desperate condition in which Mrs. Edwards reached the hospital, the very best doctor on the staff should have been assigned to her case. (Dr. Wagner had just told Edwards his wife was in an awfully bad condition.) If Dr. Wagner did not fill that requirement, it does not help the hospital's case for that fact to be known. But, whether Dr. Wagner officiated as high priest or as only a Levite, the fact remains that the sacrifice was complete, and, if it will be any gratification to the movant, we will withdraw the statement that Dr. Wagner was chief surgeon, but still think that no one but the chief surgeon should have undertaken to treat a patient in the awfully bad condition he said Mrs. Edwards was during the talk relative to financial matters.

We made no specific findings of fact in our original opinion further than were necessary to show that the evidence raised issues which should have been submitted to the jury, and it is only in deference to the vigorous, challenging insistence of the movant in this case that we have taken the time to again carefully review the record and "definitely state" our position "on the vital questions in the case."

Unquestioned and unquestionable testimony shows that during the time the undelivered fetus remained in the patient it had turned blue and was rapidly decomposing in the abdominal cavity, and that the pain, inflammation, and swelling were constantly increasing. Edwards so testified, and no one denied it. When appellee alleged that it rendered such facilities available to them, and such services available to them as are usually and customarily furnished by a hospital to any patient that might be in said hospital, it opened the door for an inquiry as to what treatment and services were rendered, and for the application of the rule of common knowledge to such matters. Their contention in this regard is on a parity with the contention that we erred in stating: "It was shown the hospital had an X-ray machine." It is true that no witness testified that the hospital had an X-ray machine which was not used, and the failure to use it constituted negligence. However, in its answer the hospital alleged that it owned an X-ray machine, and, this being the condition of the pleadings, it was unnecessary to introduce any testimony.

■ The rule is well established in Texas that it is never necessary to prove the existence of a fact alleged by both parties. Waggoner v. Edwards (Tex.Civ. App.) 68 S.W.(2d) 655; Lafield v. Maryland Casualty Co., 119 Tex. 466, 33 S.W. (2d) 187; Caulk v. Anderson, 120 Tex. 253, 37 S.W.(2d) 1008; Luckel v. Sessums (Tex.Civ.App.) 71 S.W.(2d) 579; Southland Greyhound Lines v. Taggart (Tex. Civ.App.) 70 S.W.(2d) 244; Yarbrough v. Dallas Ry., Etc., Co. (Tex.Civ.App.) 67 S.W.(2d) 1093; Robbins v. McFadden (Tex.Civ.App.) 61 S.W.(2d) 1032.

We are also severely criticized for saying that defendants diagnosed her trouble as inflammation, tumor, locked bowels, and gas on the stomach, and movant asserts that our statement is "absolutely without any support in the evidence," and challenges us to point out the portions of the statement of facts which we conceive supports such a finding.

We are not required, of course, to do this. It is part of the duty of counsel to know what the statement of facts shows, and, if they read it with the proper degree of care, they would have found that we did not go very far astray. Edwards testified that, while he was talking to Dr. Wagner, "I also asked him—she complained of severe pains all through her abdomen, and I asked him why she had those.

"Q. All right, what did he say? A. He made the statement at that time that sometimes a tumor caused such things.

"Q. All right, go ahead. A. And I says, 'What kind of a tumor would you call it?' He says, 'What kind did she have before?' I says, 'They said it was an ovarial tumor.' He says, 'That is probably what she has now.'"

The evidence showed that Mrs. Edwards' left ovary had become encysted several years before, and that it, together with the tumor, had been removed. Speaking of absurdities, how many ovaries did she have in her left side? Can there be a second "ovarial tumor" in the absence of the ovary?

This opinion expressed by Dr. Wagner did not meet the approval of Dr. Olin Key, who testified that, in assuming that Mrs. Edwards had formerly had an ovarian cyst on the left side which had been removed with the tube an abdominal tumor did not tend to recur on the same side always.

After the birth of the first baby, Dr. West was called to the Edwards' home and the doctor's attention was called to the lump or mass in Mrs. Edwards' side. Edwards testified:

"She (Mrs. Edwards) asked her (Dr. West) what that was in her side.

"Q. Your wife asked Dr. West that question? A. Yes, sir, she examined it."

"Q. And told your wife that might be pressure against the intestines which would prevent a bowel action?

"A. No, she didn't say that. She said it was locked bowels. She said nothing about any pressure at that time."

The baby was born on the morning of the 8th. Edwards testified he called Dr. West that night because his wife was vomiting so bad and was awfully sick, and that Dr. West said she had locked bowels.

Neither Dr. West nor Dr. Wagner denied this testimony, and it is a significant fact that neither of them testified in the case. After Mrs. Edwards had been in the defendant hospital for a short time, Edwards testified that Dr. Wagner came into the room where his wife had been carried, and removed the pack and said to keep up the treatment.

"I followed him outside the room after he examined her, and I asked him, I says, 'What causes so much swelling there?' He says, 'It is inflammation there now.' That is the reason we are keeping the hot packs on her, to remove the swelling.'"

The above-quoted testimony shows that our statement as to tumor, locked bowels, and inflammation had some "support in the evidence," but we did err in saying that the defendants included gas on the stomach in this diagnosis. The only place where we find the word "gas" in the statement of facts is where Edwards testified that Dr. West gave Mrs. Edwards an enema and said, if she was not better in the morning, she would have to be taken to the hospital. He was then asked, "What effect did that (the enema) have?" He answered, "She had some gas not a great deal." So the "gas" part of our statement seems to be an empirical psychological impression made upon the mind of the writer during counsel's extended argument. Reacting to the effect of appellee's motion, we will, therefore, by a process of judicial regurgitation, omit and/or emit the gas.

We are further criticized for saying that the testimony tends to show that the fetus was a female, fully developed, and ready for parturition on February 8th. This is also challenged "as being without any support in the evidence."

The uncontradicted testimony of Edwards, who was certainly deeply interested in the matter, is that the dead fetus which Dr. Krueger removed appeared to be an apparently regularly formed baby; that it had hands and feet, its sex was determined; that it had head and eyes and seemed to be a normal baby in every way; that it looked like the other one, only this one was blue and dead, and seemed to be exactly the same size of the one born alive.

Dr. Key, who witnessed the operation in which Dr. Krueger removed the dead fetus, was asked to tell the jury whether the fetus was fully developed or not. He said it was nearly a term baby, and was nearly ready for delivery, not quite, and that there was some evidence of decomposition. He testified that he did not go near the patient while Dr. Krueger was operating because he had not put on sterile clothes and prepared himself to assist in the operation. He declined to say there was an ectopic fetus. He stated that it was found that the uterus or womb had a rent in it. This statement was improperly ruled out by the court upon objections made by the hospital's counsel. We think it was admissible as part of the res gestæ.

Dr. Stiles, who was first assistant surgeon in the Lubbock Sanitarium, and who participated with Dr. Krueger in removing the dead fetus, and whose testimony was clear, positive, and convincing, and has not been questioned, testified positively upon this point as follows:

"We made an incision in the abdominal cavity and removed about a gallon of fluid, pus, from the abdominal cavity, and removed a dead fetus and put in drainage.

"Q. You mean by a fetus a baby? A. Yes, sir.

"Q. Was it a fully developed baby? A. Yes, sir."

He then said there was no sign of an ectopic pregnancy. He further testified that there was a rent or what could be called a "tear" in the patient's womb, and that the baby which was removed at that time was in a decomposed condition, and had been dead "some days"—"a long time."

We think this testimony, by the witness best qualified upon that point, sustains our statement. We did not undertake to quote the evidence of each of the witnesses verbatim.

They further challenge this statement in the opinion: "Dr. West admitted her relation to Mrs. Edwards as being that of physician and patient, alleged that she diagnosed Mrs. Edwards' trouble as an ovarian tumor, and had her brought to defendant's hospital for diagnosis and treatment by it and its doctors and nurses, and in particular by Dr. Wagner of said hospital. She alleged that she gave her codefendant a complete history of Mrs. Edwards' condition of health as it had been observed by her and as related to her by Mrs. Edwards and her husband."

We think this is a fair synopsis of the facts pleaded when her answer is considered as a whole. We fail to see, however, the importance of this complaint about pleadings, since appellee's contention is that the evidence justified the court in directing a verdict. She did allege that she gave Dr. Wagner a complete history of the case. If Dr. Wagner was connected with the hospital, which the evidence strongly indicates, then the hospital had the history as a matter of law.

They further challenge our statement that Dr. West had Mrs. Edwards brought to the hospital and its doctors and nurses. We are asked to be good enough to point to that portion of the pleading of the appellee which we conceive to be susceptible of the construction placed upon it by this court. The movant insists that we have grossly erred in interpreting the pleading of Dr. Anne West when we stated that she alleged that she brought the patient to the hospital and to its doctors and nurses. The opinion stated that Dr. West did allege that she used ordinary skill, care, prudence, and diligence to ascertain her condition, and in having her brought to the hospital and its doctors and nurses, and is almost conclusive against the appellee upon that point. We are further of the opinion that Dr. West's pleading, when considered as a whole, presents that issue. She alleged that she "came to the opinion that Mrs. Edwards was in need of hospitalization." "Hospitalization" means "placing a sick person in a hospital." They are not usually placed there for fun or recreation or to be treated by the scullion maid and janitor. The purpose in placing a sick person in a hospital is for care and treatment by those in charge of the hospital who, as we think appears from the record in this case, were its doctors and nurses. At least the testimony tends strongly to show that those who cared for her after her hospitalization were the nurses and a doctor of the hospital.

We have already disposed of the contention that we erred in stating that there was an X-ray machine in the hospital which could have been used and which the appellees failed to use. It was conceded practically by both sides that the machine was not used. The objection that we said the appellees failed to use it is hypercritical. The record shows that X-rays are used by specially trained experts. Since the possession of an X-ray machine was admitted by both parties, the jury could not assume that it was there purely as an ornament, but would have been justified in assuming that they had an expert, and that it was the duty of the hospital and its doctors to use it in this case. We think the statement as made is correct, and we decline to change it or amend it in any way.

They further say that this court erred in stating "that upon arrival at the hospital Mrs. Edwards was immediately taken charge of by the nurses of the institution and carried into the hospital," and we are requested to point out in the statement of facts any testimony that the nurses who took charge of Mrs. Edwards when she was brought to the hospital were its employees. This criticism is frivolous—positively absurd.

Mrs. Lee, who accompanied Mrs. Edwards and Dr. West when she was first brought to the hospital, testified that she came along with the others for the purpose of bringing the baby. She said: "We drove up to the back entrance (of the hospital) where they receive their patients and where they go out, and nurses came

and got Mrs. Edwards and put her on this bed and took her inside the hospital, and then a nurse came out and got the baby, and I took Dr. Anne's (West) car and went to the Lubbock Sanitarium to get Mr. Edwards." It would be unreasonable to assume that the nurses who came out of the defendant hospital and took the baby and patient back into the defendant hospital were nurses from the Lubbock Sanitarium or a hospital in Amarillo or Addis Ababa, and we are justified in assuming that the hospital sent its own nurses.

In preparing their motions for rehearing, counsel seem to have ignored the cardinal rule of evidence that a jury may assume the existence of one fact or facts from the proof of a relative fact, and may indulge all reasonable inferences from the facts shown by the evidence which unbiased and rational minds can properly deduce from the facts proved. Associated Ind. Co. v. Baker (Tex.Civ.App.) 76 S.W. (2d) 153; Galveston, H. & S. A. R. Co. v. Cook (Tex.Civ.App.) 214 S.W. 539; Mrs. Baird's Bakery v. Davis (Tex.Civ.App.) 54 S.W.(2d) 1031; Cotton v. Cooper (Tex. Civ.App.) 160 S.W. 597. The jury may also infer the existence of one fact from other facts of which the court takes judicial notice, or even from facts established alone by circumstances. Pink Front Bankrupt Store v. G. A. Mistrot & Co., 40 Tex.Civ.App. 375, 90 S. W. 75; Wright v. Hawkins, 28 Tex. 452; Woods v. Durrett, 28 Tex. 429.

Appellees might as plausibly contend that the appellants, who were suing doctors to recover against them as such, failed to prove that Drs. West and Wagner were real doctors. They did prove that Drs. Key, Clark, and Stiles graduated from accredited medical schools, but there is no direct proof that either Dr. West or Dr. Wagner ever entered the portal of a medical school, remained during the required period of gestation, and were born in the regular manner from its womb, enveloped in a sheepskin placenta. However, from the evidence the jury could reasonably assume that they were probably ectopic doctors, and there is abundant proof that they were thoroughly schooled in the use of hypodermic and rectal syringes, and specialized in hot packs and recurrent ovarian tumors.

We still adhere to the statement that the evidence was sufficient to have required the trial court to submit the issue of the relationship between defendants to the jury. Whether they were joint tort-feasors or a technical partnership existed is immaterial. If Dr. Wagner acted as agent of the hospital, or in co-operation with it, the latter would be liable. There was an effort made to prove that Edwards employed Wagner, but they failed in this because Edwards testified that he did not see Wagner until his wife had been there for a day or two. If Wagner was employed by any one, it was by Dr. West. It is true that Edwards accepted Wagner's services, just as he accepted the services of the hospital and its nurses.

We are taken to task because we said: "But we do not subscribe to the doctrine that mere proof of bad results is no proof of negligence in any case, and that the issue of negligence is one for experts only to determine."

If the appellees contended for anything in this case, it was for the two propositions just stated, and they cited an array of authorities holding that no one but a medical expert could say whether there was negligence in a case of this kind or express any opinion or testify as to what they saw or heard. The first objection along this line was made when Edwards undertook to detail to the jury what was said and done by his wife and Dr. West on the night of the parturition. He started out by saying: "After we called her (Dr. West) she came out there and my wife told her, says, 'I am ready.'"

Appellee's counsel then said: "We object to any conversation or this witness detailing any conversation on the part of Mrs. Edwards. He sues in this case as surviving administrator. Under the statute he would not be permitted to detail the conversation or transaction with the deceased."

Dr. West's counsel made the same objection. Appellants' counsel insisted that: "This conversation as between Dr. Anne West and Mr. Edwards and Mrs. Edwards is certainly binding as against Dr. West."

Appellee's counsel then said: "It is not. It is hearsay. The statute forbids the survivor of a community to detail conversations of the spouse and when there are other defendants in the case who are not parties to that transaction and not bound by it, it would be especially true. I think the Court knows this question is going to come up all the way through the case, and

might as well settle it now, and it would probably be better to retire the jury."

The jury retired.

The only statute which even distantly squints at any such proposition as the one announced by appellee's counsel is article 3716, which is: "In actions by or against executors, administrators, or guardians, in which judgment may be rendered for or against them as such, neither party shall be allowed to testify against the others as to any transaction with, or statement by, the testator, intestate or ward, unless called to testify thereto by the opposite party; and the provisions of this article shall extend to and include all actions by or against the heirs or legal representatives of a decedent arising out of any transaction with such decedent."

This statute has no application whatever to this case. It is true that plaintiffs, Edwards and his three minor children, alleged that they are the surviving husband and children of Vergie Edwards, deceased; that they are the only heirs at law of said deceased, who died intestate on March 11, 1934; that there was no necessity for administration on the estate of deceased; that she left no debts and no obligations; that plaintiffs bring this suit independently and in the capacity as heirs of the estate of said deceased, and as community survivor thereof, to recover damages against the defendants for their pecuniary loss on account of the negligence of the defendants in causing the injuries and death of the said Vergie Edwards, and for the physical and mental suffering of the said Vergie Edwards in her lifetime.

Plaintiffs took a nonsuit as to that part of their petition in which they sought to recover for physical and mental suffering of Mrs. Edwards.

Edwards could recover only as an individual. His children could recover only as individuals through their father as next friend. The amount, if any, recovered by Edwards would not be community property. The community ended with the death of Mrs. Edwards, and there was no community to own the fund if recovered. No right to recover ever existed until her death. He was neither executor nor administrator, and had not been appointed a legal guardian for his children, so all that part of plaintiffs' petition is surplusage. This was not an action by any executor, administrator, or guardian, nor against any

such party. Edwards' efforts to relate what was done on that occasion was not a statement as to any transaction with, or statement to him by, any testator, intestate, or ward. The proposed testimony did not arise out of any transaction had by Edwards or his children with the deceased. Humble Oil & Refining Co. v. Ooley (Tex. Civ.App.) 46 S.W.(2d) 1038; Simon v. Middleton, 51 Tex.Civ.App. 531, 112 S.W. 441.

Wallace v. Stevens, 74 Tex. 559, 12 S. W. 283, is a case in which Mrs. Wallace, the widow, sued for herself and use of the children of her deceased husband for damages resulting from the killing of the husband and father in a personal difficulty. Over objections of plaintiff, the court permitted the defendants to testify in their own behalf as to statements and conduct of deceased and all that transpired between them and him pending the difficulty. It was contended, as in this case, that it violated the statutory rule of evidence. The court said: "The exceptions to the general rule laid down by the statute above quoted do not, however, in terms or by implication, include the defendants to this action, so as to deny them the privilege of testifying. This is not a suit by the heirs or legal representatives of J. H. Wallace, deceased. Plaintiff does not sue for any right inherited from deceased; for any compensation he would have been entitled to. Plaintiff sues only for compensation for what she and the children of deceased have lost by the death of the husband and father,—damages resulting to them which the law declares they are entitled to recover on account of their own loss. Deceased is not represented in this suit. The widow and children merely represent themselves, and sue upon their own claim, allowed by law. We think there was no error in permitting defendants to testify as they did."

This objection was made repeatedly and sustained, as shown by numerous rulings in the statement of facts, which resulted in depriving the appellants of valuable testimony. It is the universal rule that, where a case has been tried upon a mistaken theory and either party has been deprived of material testimony or valuable rights by reason of such error on the part of the court or counsel, the ends of justice require a reversal of the case in order that it may be correctly retried. 3 Tex.Jur. 1226, par. 857; Waggoner v.

Herring-Showers Lumber Co., 120 Tex. 605, 40 S.W.(2d) 1; Gibson v. Hicks (Tex. Civ.App.) 47 S.W.(2d) 691; Anderson v. Walker, 95 Tex. 596, 68 S.W. 981.

In one of the motions, complaint is made that no exceptions were taken to the court's action, and that seems to be, in a measure, true, which is positive proof that both the court and counsel were proceeding upon a mistaken theory that nothing said by any of the doctors, by Edwards, by Mrs. Edwards, the visiting neighbor ladies, or in fact any one else who had any damaging testimony, should be admitted. Acting under this mistaken theory, much material testimony was offered by plaintiffs and excluded, not only in virtue of the statutory provisions, but as being hearsay. It would be an interminable job to go through this statement of facts of 175 pages and point out and recite the great volume of testimony excluded as hearsay which was clearly admissible under the rule of res gestæ. This rule is an exception to the hearsay rule. 17 Tex.Jur. pp. 613–616.

A conversation between Edwards and Dr. Wagner was admissible whether any representative of the hospital or Dr. West either happened to be present. If the case is tried with the proper understanding and application of the res gestæ rule, a great deal of material testimony which was excluded will be admitted, but it was tried upon the opposite theory. On account of these erroneous rulings the case was not fully developed, and should be reversed for that reason.

Another erroneous theory which frequently prevailed throughout the trial was that no lay witness could testify to any fact which even smacked of medical matters. For instance, after Dr. West had decided that the patient should be carried to the hospital, she came over to the Edwards home and inquired of Mrs. Edwards: "Have you decided to go to the sanitarium?" Mrs. Edwards replied: "Yes, I think I had better go," and Mr. Edwards said: "We were talking as to where we would take her."

Appellee's counsel then asked: "Who are you talking about?"

Edwards replied: "Dr. West and myself and my wife."

Then this question was asked: "Just before getting to that, state about your wife's enlargement as compared to the other children she had delivered," and ap-

pellee's counsel interposed: "We object to that as more medical testimony from an inexpert witness." The court overruled the objection that time, and Edwards answered: "She was much larger than she had ever been with any of the other children."

Then Edwards' counsel asked him:

"Did you see or feel any movement? A. Yes, sir.

"Appellee's counsel: That is medical testimony from a lay witness.

"The Court: Sustain the objection," and, upon request of appellee's counsel, excluded the answer.

Edwards was asked: "What was your wife's condition with respect as to whether she was swelling after she returned home [from the defendant hospital]?" He answered: "She was swelling."

"Appellee's Counsel: Just a minute. So far as the West Texas Hospital and Dr. Wagner are concerned, we object to any testimony as to her condition after she left the hospital. Just hearsay evidence. (The court assented.)

"Appellants' Counsel: If negligence on their part is established, it becomes material as to what follows the negligence, and I think it is admissible on that theory.

"The Court: Yes, sir, but also that cannot be considered by the jury as against them at this time."

The uncontradicted testimony of Edwards and of three of the ladies living in the neighborhood who stayed with Mrs. Edwards was that her abdomen commenced to swell within a few hours after the first child was delivered, that it never stopped swelling, and some of the witnesses described her abdomen as being very tight and hard. She was swelling from the time she reached the defendant hospital until she left, notwithstanding hot packs, hypodermics, and enemas galore. If she continued to swell after she returned home, it was clearly admissible as throwing light upon the charge that the defendants had not properly treated her, and comes unquestionably within the res gestæ rule.

Speaking again of absurdities—appellee's counsel objected to Edwards' statement that she appeared to suffer great pain and complained all the time. He further objected to the statement of Edwards that she suffered so her hands would draw, and vomited every time they gave her water or anything to eat, and that she could not retain anything on her stomach.

When Edwards stated that, after his wife was carried to the Lubbock Sanitarium and was operated upon by Dr. Krueger, he was present, and in describing what the doctors were doing he said: "They made an incision about six inches long near her navel and commenced to pump pus from her." This was objected to upon the ground that the witness did not know what that was, and, when asked if he knew, he said it was a form of corruption. Appellee's counsel then stated: "He is not a medical expert. His knowledge is the lay opinion of a non-expert witness."

Edwards made the further statement that, after the doctors pumped out the gallon of pus, Dr. Krueger reached "down in there (the patient's abdomen) and said, 'Here is another baby,' and they took it out." This was objected to as a hearsay statement, and because it was getting the witness' medical testimony before the jury without his being properly qualified to so testify, and this objection was sustained and the evidence was excluded from the jury.

These are only a few instances which we have culled from the statement of facts to sustain our holding that this case was not fully developed, and was tried, not only upon one mistaken theory, but upon several. The tendency of the courts is to enlarge and liberalize the rule. These considerations alone would require us to reverse the judgment and remand the case in order that the plaintiffs may have a fair opportunity of developing the facts.

■■■ We may be in error in holding that not only an expert witness, or in other words a doctor, can testify in cases of this sort as to what constitutes negligence, but we think the Texas cases cited in our original opinion hold to the contrary. Certainly an anxious husband and kindly neighboring women can testify whether there was a mass or knot left in the patient's abdomen after the birth of the first child. We think they should be allowed to testify that her skin was yellow after she came back home; that from her groaning and appearance they knew she was suffering; that her abdomen was swelling from day to day. If the husband is not allowed to state the comparative size of his wife's abdomen during the last and previous pregnancies, and testimony of this sort can only be elicited from doctors, then the sooner the rule is changed the better.

The average juror does not have to be told that, if the tumor in a pregnant woman kicks, it is not a tumor, nor does he need an expert to tell him that, when a woman is pregnant with two children and the womb has been ruptured, the rupture is not due to natural causes, especially after the doctor has pressed on her and along the line of the womb. While some of the doctors testified that ectopic pregnancy was very rare, they failed to tell the jury that in any of those cases the wall of the uterus has been torn, one fetus was found out in the abdomen with the placenta full of an excessive amount of blood which indicated a ruptured uterus, and that this blood was mixed with pus and fecal matter, and, where pertinent facts like these appear in a case and the experts fail to tell the jury what it means, surely the jury should be allowed to exercise their own common sense. If it is not the rule, it should be.

The average juror certainly has sense enough to know that where there is vomiting there is nausea; that, where a dead fetus has turned blue and decomposition has set in, it did not die in the abdomen within the last few hours; that, where there is no evidence of ectopic pregnancy, a rent is found in the wall of the womb, and one twin is in the womb and the other is out in the abdomen, unborn babies did not tear open the womb.

■■■ Edwards was asked if he was present when Dr. West made an examination of his wife to determine her condition and form an idea what time she would likely give birth to a child. He said that he was, but did not know whether the examination was very thorough or not. He said that Dr. West pressed her hands on his wife's abdomen and along the outline of the womb, and at that time his wife thought she was going into labor pains. This testimony is certainly pertinent, and the jury should have been permitted to consider it upon the issue of when the uterus was ruptured.

Dr. West, Edwards, his wife, and neighbor women who visited her all expected the birth of twins. Within an hour or two after the birth of the first baby the "mass," "lump," "knot," or "tumor" (as it was variously called by the witnesses) moved from the region of where the left ovary formerly was located down into the pelvic cavity and rested on the left side of the patient's womb; that being the side of

the wall of the womb which was ruptured. Yet it is insisted that Dr. West was justified in thinking it was another ovarian tumor. She knew the left ovary had been removed several years prior to that time. Did she think Mrs. Edwards had acquired another left ovary? If not, then the jury might have concluded that Dr. West was negligent in failing to ascertain whether the lump was the expected baby No. 2, and whether it was dead or alive.

The record shows that she gave Dr. Wagner a full history of the patient soon after her arrival at the hospital. If so, then Dr. Wagner knew that the left ovary had been removed and that the lump could not possibly be a second encysted left ovary. If Dr. Wagner was connected with the hospital, then, as a matter of law, the hospital knew it. Under these facts, the jury should have been permitted to say whether the failure to use the X-ray and ascertain the exact nature of the lump was negligence.

We are asked in the motion whether we hold that the mere fact that Dr. West and/or Dr. Wagner failed to discover this second child, and therefore failed to deliver the second child, is in itself sufficient to warrant the submission to the jury of the issue as to whether or not these doctors were guilty of negligence. Under all the other circumstances shown, that is exactly what we hold.

Movant insists that we are "hopelessly in error" when we hold that the issue of negligence in several particulars under the evidence in this case were questions of fact to be submitted to the jury, and insists that some medical witness must have first testified from the witness stand that either in the diagnosis or the treatment, or both, of this patient, the doctors in question either did something which it is not recognized as good practice in cases of this character or failed to do something which would be required in the exercise of good practice in this character of case. To adopt that rule as the exclusive practice in such cases would be to repeal that article of our state Constitution which guarantees to every litigant the right of trial by jury and would convert juries in such cases into rubber stamps. No jury would be needed.

They further say: "As we interpret the Court's opinion, notwithstanding the fact that no physician testified that in the exercise of ordinary care and skill in the diagnosis of this case an X-ray photograph of this patient should have been taken, the mere fact that one physician did testify that the taking of an X-ray photograph would have been proper practice, was sufficient to raise the issue of fact as to whether or not the failure to use the X-ray was negligence."

This interpretation is correct. We said that and more: When it was shown that the use of the X-ray would more than probably have disclosed the nature of the lump, and shown that it was a dead fetus, then there was no necessity for a doctor to say that the failure to use the X-ray was negligence. And we think the jury would have so held.

They insist that this would have been permitting the jury to "speculate" as to what is or is not good practice and diagnosis, and that only an expert physician could so "speculate." If there had been a little more speculation by the doctors with reference to the nature of this lump prior to the time Dr. Krueger saw the patient, she would possibly have been alive to-day. Shortly after seeing the patient, he said that an abdominal operation was necessary. It is clear from the record that appellants were handicapped during the trial by the reluctance of physicians to testify with reference to the mistakes of other doctors. It is a matter of common knowledge that they have a rule, known as "professional courtesy," which is endemic in the medical profession, and with reference to this case it seems to have become an epidemic in that vicinity and was badly overworked. There were eleven prominent doctors listed on the hospital's stationery, including Dr. Wagner, and from none of them was a sound ever heard. Even Dr. West, who was charged with malpractice, and a woman, failed to chirp. It was shown that Dr. Krueger was on his way to Fort Worth while the case was being tried. It is characteristic of such testimony that it is so uncertain and unsatisfactory that little information may be gained from it. However, Dr. Stiles is a notable exception, and Drs. Clark and Key, on account of unfamiliarity with the facts in the case, were not able to give much information. These circumstances account, in some measure, for the failure of plaintiffs to fully develop their case, and require a reversal and remand.

This interrogatory is propounded to us by Dr. Anne West's attorneys: "Was

Mrs. Edwards ever at any time, while under the observation of Dr West, physically able to be operated upon?

If intense physical, nerve-racking pain is debilitating, and/or if the intense suffering incident to the use of hypodermics and rectal syringes and being tormented by hot packs lowers a patient's vitality, and/or if the presence in the patient's abdomen of a lacerated uterus and a decaying fetus from which the patient must necessarily absorb toxin tend to lessen the powers of resistance, and/or if the swelling was increasing from day to day and the inflammation growing worse hourly, then we unhesitatingly say that the sooner the rotting fetus is removed the better the chances of the patient's recovery would be, and, since Dr. West was the first physician who had the patient in charge, we think the operation should have been performed while she was under Dr. West's observation, and so hold.

The name of Dr. Krueger was inadvertently used in the original opinion instead of Dr. Key. This resulted probably because the stenographer's notes read "Dr. K.," and in transcribing it was written "Krueger" instead of "Key." The original opinion is therefore corrected in this particular.

We make it a rule never to discuss the testimony further than is necessary to dispose of the issues, nor would we have discussed it as fully as we have in this case but for the unjust criticisms and challenges hurled at us by counsel and their insistence that we do so.

It is unnecessary to discuss the other two motions, since what we have said disposes of all the material questions raised in the three motions. They are all three overruled.