**Eric McEACHERN, Appellant,**

v.

**GLENVIEW HOSPITAL, INC., Appellee.**

**No. 17470.**

Court of Civil Appeals of Texas,
Fort Worth.

Feb. 1, 1974.

Rehearing Denied March 1, 1974.

McBryde & Bogle, and Bill F. Bogle, Fort Worth, for appellant.

Anderson, Henley, Shields, Bradford & Pritchard, and C. A. Searcy Miller, Dallas, for appellee.

## OPINION

LANGDON, Justice.

Eric McEachern, herein called appellant, initiated suit against Glenview Hospital, Inc., herein called appellee, to recover damages for personal injuries sustained by him when he fell from appellee's emergency room table due to the alleged negligence of appellee, and its nurse-employee, Holly Cannon Shipley, herein called Holly Cannon. The case is one for ordinary negligence arising out of the appellee's contract to render services to appellant. It was tried before a jury which returned a verdict in favor of appellant for $1,054.50 medical expenses and $6,000.00 for pain and suffering and loss of wages. Appellant filed a motion for judgment, and appellee filed its motion for judgment non obstante veredicto. On May 29, 1973, the court overruled appellant's motion, sustained appellee's motion for judgment non obstante veredicto and entered a take-nothing judgment against the appellant.

In answer to special issues Nos. 1, 2 and 3 the jury found, respectively, that on the occasion in question appellant was left on an emergency room table unattended by any hospital personnel (Issue 1); that such action was negligence (Issue 2); and that such negligence was a proximate cause of the occurrence in question (Issue 3). In response to Issues Nos. 11 and 12 the jury found that the nurse, Holly Cannon, failed to keep such a lookout for the

appellant's safey as a nurse using ordinary care would have kept (Issue 11) and that such failure was a proximate cause of the occurrence in question (Issue 12). Special Issues Nos. 13 and 14 are the damage issues.

The trial court's judgment reflects that it was ". . . of the opinion that under the evidence in this case there was no legal duty shown to have been breached by the Defendant or its nurse-employee, and that there was no evidence on the record to support the foreseeability element in the proximate cause findings of the jury in answer to Special Issues Nos. 3 and 12, . . . ."

The appeal is based upon five (5) points under which the appellant contends that the trial court erred in overruling his motion for judgment, and in granting appellee's motion for judgment non obstante veredicto because there was some evidence of probative force to support the foreseeability element in the proximate cause finding of the jury to Special Issues Nos. 3 and 12 and to show a breach by appellee of a (1) legal duty not to leave appellant unattended by any hospital personnel and (2) to keep a proper lookout for appellant's safety.

We reverse and render.

The testimony deemed pertinent to this appeal is summarized in the paragraphs next following. The summary is rather detailed because we have determined the case should be reversed and because of complaints contained in cross-points raised by the appellee.

On October 3, 1969, appellant, while working as a nightshift employee of a supermarket, cut his left thumb. A fellow employee drove him to appellee's emergency room. The nurse, Holly Cannon, was on duty and was "in charge of the emergency room." She was not the only nurse on emergency room duty. Appellant was placed on an emergency room table. She placed his hand in a pan containing a solution and left the room, leaving him unattended. Meanwhile, Mr. and Mrs. James McEachern, parents of appellant, who was not yet 21, were called by telephone and advised of his injury. They arrived at the hospital, where they found Eric sitting on the table in the emergency room with no one in attendance. This was around two or three o'clock in the morning. Mr. McEachern went to find a nurse and did find Holly Cannon. The nurse then came to a point just outside of the emergency room in the hall and got some papers for Mr. McEachern to sign and stood near the door while he was signing them. This was some 12 or 15 feet from the emergency room table. Mrs. McEachern at this time was standing near Eric but was not caring for or purporting to render aid to him in any way and was doing nothing but waiting for the doctor to arrive. She had not been asked by the nurse to assume his care. Appellant started getting rather white and said that he had to vomit. Mrs. McEachern thereupon asked the nurse to try to find something for him to vomit in. According to Mrs. McEachern, the nurse "turned around and looked, but then she still kept on signing papers." Again, appellant said, "I am going to be sick." The nurse made no response, other than turning around and looking. Mrs. McEachern, knowing that appellant, "really meant it" and that he "couldn't wait any longer," went over to a counter to try to get a basin. Before she reached the counter, she heard a thud and turned around to see appellant lying on the floor. His subsequent medical examination showed that he had fainted from psychogenic shock, fallen and had broken out two front teeth, to the point of exposing the pulp in one, fractured his other thumb, i. e., the thumb on his right hand, and received a cerebral concussion from the fall, having hit his head on the hard floor. Additionally, he had a bruise on the shoulder. Appellant also sustained a permanent loss of memory of a short span of time surrounding the fall.

Dr. David Pillow, a member of appellee's staff, was the doctor on call at appellee's

hospital that night. He was called to render aid to appellant and arrived about ten minutes after he had fallen. He was also appellant's family doctor. Appellant was still on the floor at the time Dr. Pillow arrived. The doctor and the others present helped lift appellant back up on the table. He was limp at that time. Dr. Pillow stitched the lacerated left thumb and called in Dr. O. D. Raulston, Jr., an orthopedic surgeon, to operate on the fractured right thumb. Also, a dentist, Dr. J. W. Cobb, was called in for treatment of the broken teeth. Dr. Raulston set the fractured right thumb by drilling a hole through the two fractured pieces of bone and driving a metal pin through the hole. A cast was placed on his right hand and left there until November 10, 1969.

Dr. Cobb and Dr. Stubblefield treated appellant for his broken teeth which required extensive dental work, including a root canal performed by driving a metal pin into the tooth, the removal of the remains of one tooth, and the installation of various bridges and appliances.

Appellant was off work for approximately six weeks because of the accident, during five of which he had a cast on his right hand. He lost approximately six hundred dollars of wages. His work required the use of both hands. For two or three months while he had to wear temporary caps on his teeth he was restricted to a liquid diet. Even at the time of the trial, some three and one-half years after the injury, he had severe pain in his right thumb whenever he picked up anything heavy or tried to use force. This interfered with his job, at that time, as an aircraft mechanic in the Navy. Also, his hand still ached and cramped and had a noticeable bump or raised portion near the base of his thumb.

Mrs. McEachern was in the emergency room with appellant constantly from the time she first arrived until after he fell. At no time prior to the fall did she ever observe any nurse rendering any aid or treatment to appellant.

Upon arriving at the hospital, Mr. and Mrs. McEachern looked in each of three emergency rooms to find Eric, and he was in the last room that they looked in. At that time, there were no other emergency room patients in any of the rooms. Later, a boy around ten years of age was brought to one of the other emergency rooms. At one time the nurse, Holly Cannon, testified that this was "not before" Eric McEachern fell. She subsequently retracted her testimony, in response to a question from appellee's counsel, and said that he came in before appellant fell. This patient was discharged shortly thereafter in "good condition" and nurse Cannon had finished attending him and had returned to the point just outside the door of the room appellant was in prior to the time that appellant fell. It is clear from the record that the nurse in charge was more attentive to the matter of getting paper forms filled out by appellant's father than she was to her patient. This was the choice she made although other personnel was present to handle the paper work. Appellee admitted in response to written interrogatories that "Holly Cannon (was not) the only employee of Glenview Hospital who was on duty in the emergency room" at the time and on the occasion in question. The nurse also testified that she could have called for help had she needed it. In fact, after appellant fell his father looked for and found another nurse who came to help.

The only doctor to testify concerning the cause of the fall was Dr. David Pillow, the doctor on call on the evening in question, and a member of the staff of appellee. Dr. Pillow, who had seen appellant in the hall when he first came into the hospital, testified that someone came and told him that appellant had fallen and he went to the emergency room. He testified that appellant had "fainted and fallen from the table" and that this was a foreseeable result of his initial injury:

"Q. All right. Do you have any opinion as to why he fainted on that night, Doctor?

"A. I think that he had psychogenic shock. I think when people are injured and have a blood loss they can faint.

"Q. In other words, it would not be an unexpected thing, would it, for a person with an injury of that type to faint?

". . .

"A. Certainly not uncommon or unexpected, no. . . . But, big, strong people do faint, yes.

"Q. With only very minor injuries sometimes?

"A. With almost no injury. It's so-called psychogenic thing. It's like the soldier getting a simple immunization in his shoulder and will walk a few steps and then faint. This is psychogenic shock. It has nothing to do with blood loss or injury. It has to do with the patient's reaction to what's being done to him."

Additional to his testimony that it was not unusual or unexpected for a person with a minor injury such as appellant had to faint from psychogenic shock, Dr. Pillow also testified that "I still feel he had psychogenic shock, which is common and usual in males with injuries . . . ."

With respect to foreseeability, Dr. Pillow testified as follows:

"Q. The fact that he did look alert and was not sweating when you saw him, that certainly didn't foreclose the possibility of his going into psychogenic shock, did it?

"A. No, absolutely not.

"Q. And, even though you may have decided in your own mind that there was little possibility that he would go into blood-loss shock, state whether or not you did foreclose the possibility of his going into psychogenic shock?

"A. No, I didn't do away with the thought that he might go into psychogenic shock. That is always present."

Dr. Pillow testified further that the appellant should have had constant supervision:

"Q. I see. Doctor, do you have an opinion as to the type of supervision that should be given to a person having an injury of the type that Eric McEachern had when he arrived at the hospital that night? In other words, an opinion as to whether he should have close attention or whether he could safely be left alone sitting on an examining table? Do you have an opinion on that subject?

"A. Yes. I can give you my own personal opinion. I feel that any . . . injured patient should have someone with them because, you know, it is unpredictable as to what they will do."

Dr. Pillow reiterated this view as follows:

"Q. Well, Doctor, assuming that there was personnel available at Glenview Hospital that night, October 3rd, 1969, do I understand you to be of the opinion that Mr. McEachern should have had constant attention, that is, should not have been left alone?

"A. Yes.

"Q. Let me rephrase that: Should not have been left alone simply in the care of his mother?

"A. Yes.

". . .

"Q. Did the Glenview Hospital have insufficient personnel on that night? I am talking about this particular night now. . . .

"A. Not as far as I know. But then I don't know about the hospital in general, but the emergency room was staffed as usual.

"Q. And it was sufficiently staffed?

"A. Yes, uh-huh."

Dr. Pillow also testified that he really did not know of any reason why the nurse should have left appellant alone.

As further evidence of the fact that the appellant's fainting was to be expected under the circumstances, Dr. Pillow testified that, "It can happen to anybody under the most minute circumstance." And ". . . This is a very quick type of shock because in a matter of, . . . brief moments, probably less than a minute, they drop their blood pressure quite low and this is what provokes the shock is the lack of oxygen to their brain. This is a sudden occurrence."

Appellee also admitted that no precautions were taken by it to prevent appellant from falling from the examining table that Holly Cannon and Dr. Pillow were the only employees or agents of Glenview Hospital, Inc., who in any way attended, treated, rendered aid or assistance to or dealt with Eric McEachern at Glenview Hospital on the night in question and that there were no restraints or siderails used to prevent appellant from falling off the table while Miss Cannon was not in the room with him even though straps and restraints were available for use on the table.

Appellee also admitted that, "Holly Cannon did not respond to the inquiry from plaintiff's mother concerning a container in which plaintiff might vomit . . . ."

Miss Cannon testified that she knows what psychogenic shock is, was in agreement with Dr. Pillow that psychogenic shock can come on in an adult male with little or almost no injury and that psychogenic shock is not unusual or unexpected in minor injury cases nor unusual in cases such as a laceration of the thumb. She also testified that on October 3, 1969, she knew what psychogenic shock was and agreed that it does not take very long for psychogenic shock to occur. Holly Cannon testified that had she been standing at appellant's side, attending him when he fainted, she probably could have kept him from falling and in any event could have broken his fall.

The appeal involves two primary issues. (1) Did the appellee owe a duty to have someone in attendance with appellant and to keep a proper lookout for him, and (2) did appellee's failures in these regards constitute a proximate cause of appellant's injuries. If the event, or some similar event, was reasonably foreseeable, then clearly appellee had a duty to have someone in attendance with appellant and keep a proper lookout for his safety.

Rule 301, Texas Rules of Civil Procedure, provides that: ". . . the court may render judgment non obstante veredicto if a directed verdict would have been proper, . . . ."

A directed verdict is proper only if there is no evidence to support a necessary issue. In Harbin v. Seale, 461 S.W.2d 591, 592 (Tex.Sup., 1970) the court held:

"The law is clear in this state that before a trial court can render a judgment non obstante veredicto, based on the absence of evidence, it must determine that there is no evidence having probative force upon which the jury could have made the findings relied upon. . . . In making this determination, all evidence must be considered in a light most favorable to the party in whose favor the verdict has been rendered, and every reasonable inference deducible from the evidence is to be indulged in such party's favor." To the same effect see Leyva v. Pacheco, 163 Tex. 638, 358 S.W.2d 547 (1962).

The definition of proximate cause does not require that the exact event should be foreseen but simply that a person "using ordinary care, would have foreseen that the event or some similar event might reasonably result therefrom."

See Motsenbocker v. Wyatt, 369 S.W.2d 319 (Tex.Sup., 1963) and Port Terminal Railroad Association v. Ross, 155 Tex. 447, 289 S.W.2d 220 (1956).

Additional findings made by the jury were that the failure of Holly Cannon to use the straps on the table to restrain appellant was not negligence (Issue No. 4); that the failure of the defendant hospital to furnish a table equipped with siderails was not negligence (Issue No. 6); and that the nurse, Holly Cannon, should not have known that Eric McEachern was going to faint and fall off the table (Issue No. 8).

■ The fact that the jury made negative answers to the Special Issues Nos. 4, 6 and 8 does not in our opinion have any bearing in determining the issue of foreseeability. The jury simply failed to make affirmative findings from a preponderance of the evidence. It is the same as though the issues had not been submitted at all. The answers of the jury have no significance. Certainly they do not establish the converse.

In Houston Fire and Casualty Insurance Co. v. Howell, 484 S.W.2d 582, 584 (Tex. Sup., 1972) it was stated that, "The jury's answers to the quoted issues may only be interpreted as a refusal to make findings from a preponderance of the evidence, and they have no . . . legal significance . . . . ."

In Texas General Indemnity Company v. Dickschat, 440 S.W.2d 922 (Waco Tex. Civ.App., 1969, ref., n. r. e.) the court held that such findings or answers by the jury do not establish the converse.

The jury's answer to Special Issue No. 8 is not in conflict with the jury's answer to Special Issues Nos. 3 or 12. The latter required a finding of foreseeability that "the event or some similar event might reasonably result" whereas Special Issue No. 8 inquired whether Holly Cannon in fact, "should have known that Eric McEachern was going to faint and fall off the table."

An affirmative answer to Special Issue No. 8 did not require merely a finding that Holly Cannon should have foreseen that the event, or a similar event, "might" possibly occur, but required a finding that she, in fact, should have known that Eric McEachern was going to faint and fall off of the table. Issues 3 and 12 merely required findings that a person "using ordinary care, would have foreseen that the event or some similar event might reasonably result therefrom."

■ We find and hold that the submission of and the jury's answers to the proximate cause Issues 3 and 12 were amply supported by evidence of probative force.

Regarding the question of "duty" the court in Bornmann v. Great Southwest General Hospital, Inc., 453 F.2d 616, 621 (5th Cir., 1971) held: "Simply stated, a hospital is under a duty to exercise reasonable care to safeguard the patient from any known or reasonably apprehensible danger . . . . ."

Under Dr. Pillow's undisputed testimony the danger in this case was reasonably apprehensible.

See also 40 Tex.Jur.2d 450, "Negligence", Sec. 7, which states that: "If a party negligently creates a dangerous situation, it then becomes his duty to do something about it to prevent injury to others, if it reasonably appears or should appear to him that others in the exercise of their lawful rights may be injured by his negligence." Section 9 of the same text states that, "Accompanying every contract is a common-law duty to perform with care, skill, reasonable expedience, and faithfulness the thing agreed to be done, and a negligent failure to observe any of these conditions is a tort, as well as a breach of contract."

In the light of what we have written to this point we can see no necessity in discussing separately the seven (7) cross-points of the appellee. We have considered each of them. Each is overruled.

Generally with reference to the cross-points we find and hold that the court did not err in failing to allow into evidence the deposition testimony of Dr. Pillow. The testimony complained of was not responsive. The questions asked of the witness called for legal conclusions and invaded the province of the jury. Objections were timely made and were properly sustained.

As to the second counterpoint the court did not err in failing to submit appellee's definition of proximate cause rather than the one it submitted. The latter definition was proper. Rule 279, T.R.C.P.

The amount of damages found by the jury was not in our opinion excessive. In considering the evidence in this record we are of the opinion and find that the jury findings on the damage issues were very moderate and are amply supported by the evidence. In connection with the cross-points we are of the opinion that if the court did commit error with reference to any of the stated complaints of the appellee that such error, if any, was harmless.

Finally, in a suit against a hospital expert testimony as to negligence is not indispensable to recovery. Edwards v. West Texas Hospital, 89 S.W.2d 801 (Amarillo Tex.Civ.App., 1935, writ dism.). See also 40 A.L.R.3d 515, 518–519.

This Court in applying the rules enunciated by the authorities above cited is of the opinion and holds that the learned trial judge erred in granting appellee's motion for judgment non obstante veredicto and in overruling appellant's motion for judgment. The damages found by the jury amount to $7,054.50. An additional sum of $157.10 represented the amount of the hospital bill. It was stipulated by the parties that in event plaintiff was entitled to judgment that the latter sum should be included.

This cause is accordingly reversed and judgment is here rendered for the appellant (plaintiff) in the sum of $7,211.60, plus interest from the date of judgment.